318-10/JFK/CEB
FREEHILL HOGAN & MAHAR LLP
Attorneys for Defendants
Pile Foundation Construction Company, Inc.
and the Barge "UNCLE LEO"
80 Pine Street, 24th Floor
New York, New York 10005-1759
(212) 425-1900

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------x
JON DAZA,

       Plaintiff,

   - against -

PILE FOUNDATION CONSTRUCTION    10-cv-4678 (MGC)(GWG)
COMPANY, INC., ANTHONY RIVARA
CONTRACTING, LLC, URS CORPORATION,
URS CORPORATION-NEW YORK, THE     **LOCAL RULE 56.1**
CITY OF NEW YORK, THE NEW YORK   **STATEMENT OF MATERIAL**
CITY DEPARTMENT OF PARKS AND    **FACTS IN SUPPORT OF**
RECREATION, THE NEW YORK CITY     **PILE'S MOTION FOR**
DEPARTMENT OF PARKS AND       **SUMMARY JUDGMENT**
RECREATION CAPITAL PROJECTS
DIVISION, THE NEW YORK CITY
ECONOMIC DEVELOPMENT
CORPORATION and the Barge "UNCLE
LEO," its equipment, tackle and appurtenances,
*in rem*,

       Defendants.
---------------------------------------------------------x

   Defendants, PILE FOUNDATION CONSTRUCTION COMPANY, INC. ("Pile"), and the Barge "UNCLE LEO," its equipment, tackle and appurtenances (collectively "Pile" or "Defendant"), by their attorneys, FREEHILL HOGAN & MAHAR LLP, submit their Statement of Material Facts, pursuant to Local Civil Rule 56.1, in support of their Motion for Summary Judgment as follows:

374212.2

1.	This case arises out of a personal injury sustained by Plaintiff, Jon Daza ("Plaintiff" or "Daza"), on or about May 20, 2010, while on board a barge knows as the UNCLE LEO in the East River, in Manhattan, New York.  A copy of Plaintiff's Second Amended Complaint ("Complaint") is attached to the Affidavit of John F. Karpousis ("Karpousis Aff.") as **Exhibit A**.

2.	At the time of Plaintiff's injury, Plaintiff was working as a dockbuilder for Pile on a construction project known as the East River Park Project ("the Project") in Manhattan, New York.  A copy of the transcript of Daza's deposition testimony ("Daza Dep."), taken on June 9, 2011, is attached to the Karpousis Aff. as **Exhibit G**.  Daza Dep., p. 18.

3.	Pile was Plaintiff's employer and the owner of the UNCLE LEO at the time of Plaintiff accident and injury, which occurred on May 20, 2010.  A copy of Pile's Answer to the Second Amended Complaint ("Pile Answer") is attached to the Karpousis Aff. as **Exhibit B.**

4.	Plaintiff filed for workers' compensation benefits following his accident and has been collecting (and continues to receive) benefits from Pile pursuant to the Longshore and Harbor Workers' Compensation Act.  **Ex. G**, Daza Dep., pp. 62-63, 66.

5.	Pile was a contractor for the City of New York ("the City") on the Project, hired to rebuild a promenade used as a jogging path adjacent to the East River in Manhattan, New York.  A copy of relevant excerpts of the contract between Pile and the City ("the City/Pile Contract") are attached to the Karpousis Aff. at **Exhibit J**.

6.	The City also had a contract with URS Corporation and/or URS Corporation-New York ("URS") as a Project Consultant, who subcontracted with AECOM Services, Inc. and/or AECOM USA, Inc. ("AECOM") as a Marine Consultant on the Project.  A copy of the Answers

to the Second Amended Complaint of URS, The City, and AECOM are attached hereto as **Exhibits C, D, and E.**

7. The work performed by Pile under the City/Pile Contract was described in the Contract as:

> FOR FURNISHING ALL LABOR, MATERIALS & EQUIPMENT, TOGETHER WITH ALL WORK INCIDENTAL THERETO, NECESSARY OR REQUIRED FOR THE RECONSTRUCTION OF THE BULKHEADS AND RELIEVING PLATFORMS FROM JACKSON STREET TO EAST 14TH STREET, BETWEEN THE FDR DRIVE AND THE EAST RIVER, IN EAST RIVER PARK, IN THE BOROUGH OF MANHATTAN, KNOWN AS CONTRACT NUMBER M144-101M, PIN: 8462004M144C02

**Ex. J**.

8. The Project runs between Jackson Street and 14th Street along the East River in Manhattan, which is approximately 1.25 miles. **Ex. J**.

### PLAINTIFF'S EMPLOYMENT AS A DOCKBUILDER

9. Plaintiff graduated from high school in 2006, and began working for a company called Iecony as an elevator mechanic performing elevator maintenance. **Ex. G**, Daza Dep., pp. 9-10.

10. Approximately three years later, Plaintiff joined the Dockbuilder's Local Union No. 1456, as a dockbuilder. **Ex. G**, Daza Dep., pp. 10-11, 14.

11. Plaintiff's first union job was with Pile as a dockbuilder assigned to the East River Park Project, where he worked for about one year in 2008 and 2009. **Ex. G**, Daza Dep., p. 18,

23. The Project involved reconstruction of the East River Promenade on the East River Park. **Ex. H**, Nee Dep., pp. 11-12.

12. Plaintiff then worked as a dockbuilder for three to six months in 2009 and 2010 for a company called EIC on a construction project in Queens. **Ex. G**, Daza Dep., p. 19.

13. Plaintiff worked for one week as a dockbuilder for Anthony Rivara Contracting in Brooklyn, rebuilding a fender system at The Red Bull factory. **Ex. G**, Daza Dep., p. 20.

14. Plaintiff returned to work for Pile as a dockbuilder on May 19, 2010, the day before his accident. **Ex. G**, Daza Dep., pp 20-21.

15. Plaintiff drove his car to and from these job sites daily and ate breakfast and dinner at home. **Ex. G**, Daza Dep., p. 26.

16. During the time that Plaintiff worked for Pile, his work was directed by Pile's Dockbuilder Foreman, Brian Nee ("Nee"). **Ex. G**, Daza Dep., pp. 33, 221. A copy of the transcript of Mr. Nee's deposition testimony ("Nee Dep."), taken on August 2, 2011, is attached to the Karpousis Aff. at **Exhibit H**. Nee has been employed by Pile Foundation since 1998 and has worked on the Project since it began in 2005. **Ex. H**, Nee Dep., pp. 7-8. Nee is also a member of the Dockbuilder's Union, Local 1456. **Ex. H**, Nee Dep., p. 6.

17. Steve Santos was employed by AECOM, a subcontractor hired by URS as a Marine Consultant on the Project, and was at the job site on a daily basis. A copy of the transcript of Mr. Santos' deposition testimony ("Santos Dep."), taken on August 30, 2011, is attached to the Karpousis Aff. as **Exhibit I**. Santos Dep., pp. 14, 18.

374212.2

18. Santos prepared Residence Daily Reports on a daily basis, which documented the construction work performed and equipment used by Pile on the Project. **Ex. I**, Santos Dep., pp 27-28, 35, 56.

19. The construction work performed by Pile on the Project involved bulkhead demolition, ripping out old wooden pilings, replacing them with new steel pilings, and laying down concrete pier caps, pre-cast decking, and concrete subfloor. **Ex. H**, Nee Dep., pp 11-12; **Ex. I**, Santos Dep., pp. 22-23.

20. Pile's work on the Project was performed 50% from land and 50% from barges in the East River. **Ex. H**, Nee Dep., p. 17.

21. During Plaintiff's first year of employment with Pile, three barges were used on the Project: a barge known as "Brian's Barge," which was used as the crane barge, a foam barge, and the UNCLE LEO, which was used to hold contraction materials for the Project. **Ex. G**, Daza Dep., pp. 24, 52-53. The UNCLE LEO was later used as the crane barge on the Project and was used as such at the time of Plaintiff's accident. **Ex. G**, Daza Dep., p. 53.

22. Plaintiff's job duties involved driving piles, working on a crane barge hooking construction materials up to the crane and loading materials, such as precast concrete, onto the barge. **Ex. G**, Daza Dep., pp. 23, 32, 41, 47.

23. Plaintiff alleges that his job duties with Pile also included tying up the barges, pumping water out of the barges, and assisting with tugboats. **Ex. G**, Daza Dep., p. 15.

24. Plaintiff's duties also included pumping water out of the barge with a handheld portable pump. **Ex. G**, Daza Dep., p. 30. The pump could physically be taken on and off the barge and was operated by portable generators. **Ex. G**, Daza Dep., p. 30.

25. Plaintiff claims he pumped water out of the barge every 2 days and that it took between 3 to 5 hours to complete. However, Plaintiff admits that it would only take 10 to 15 minutes to set up the pumps and that he would go about his other construction related activities while the water pumped. **Ex. G**, Daza Dep., p. 233. Contrary to Plaintiff's claim, according to Nee, Plaintiff only pumped water out of the barge once or twice a month. **Ex. H**, Nee Dep., p. 24.

26. Plaintiff claims that he spent approximately 75% of his time working from a barge and 25% working from land. **Ex. G**, Daza Dep., p. 47.

27. "Brian's Barge" and the UNCLE LEO are steel spud barges that are approximately 100 yards long and 50 feet wide. They have no motor, electricity, or means of self-propulsion. **Ex. G**, Daza Dep., pp. 21, 25, 55, 84.

28. The cranes used on these barges were not permanently affixed to the decks of the barges. Rather, they could be rolled on and off as needed. **Ex. G**, Daza Dep., pp. 24-25, 83.

29. Wooden crane mats were laid down on the deck of the crane barges before the cranes were driven on to protect the surface of the barge and distribute the weight of the cranes. **Ex. G**, Daza Dep., p. 83-84; **Ex. H**, Nee Dep., p. 23.

30. Other construction equipment and materials, such as generators, portable pumps, power tools, and cargo boxes (i.e. shipping containers) used to store equipment were also loaded and stored on the crane barges for the purpose of being used in connection with the construction at the East River Park Project. **Ex. G**, Daza Dep., pp. 85-86, 231; **Ex. H**, Nee Dep., p. 21.

31. The crane barge was relocated periodically within the job site by tugboats. **Ex. G**, Daza Dep., p. 27. The tugboats were owned and operated by Seawolf Marine. **Ex. H**, Nee Dep.,

p. 26.  The purpose of moving the barge was to allow Pile to complete construction work on different areas of the jogging path being built over the East River.  **Ex. G**, Daza Dep., p. 30.  When the barge was moved, the Seawolf Marine tug captain directed the operation.  **Ex. G,** Daza Dep., p. 35.

32. Plaintiff claims he stayed on the crane barge when it was moved; assisting tugs with lines and picking up and dropping the spuds.  **Ex. G**, Daza Dep., p. 29, 37.  Plaintiff admits, however, that he was not responsible for navigating the barge and never rode on a Seawolf tug when the barge was moved.  **Ex. G**, Daza Dep., p. 27.  Plaintiff is also unfamiliar with the methods of configuration used for towing barges.  **Ex. G**, Daza Dep., p. 58.  Contrary to Plaintiff's testimony, according to Nee, Plaintiff was only ever on the barge when it was moved once or twice.  **Ex. H**, Nee Dep., pp. 28-29.  Additionally, Nee said that Plaintiff never tied lines used to move the barge; the lines were tied by deckhands on the tugboats.  **Ex. H**, Nee Dep., p. 29.

33. Occasionally Pile's barges were moved with a backhoe located on the land, by connecting a line from the barge to the backhoe and pulling the barge up to 300 feet, typically one barge length at a given time.  **Ex. H**, Nee Dep., pp. 27-28, 30, 103.

34. The vast majority of the barges' movements were short distances, i.e. "barge lengths," within the job site.  **Ex. G**, Daza Dep., 29.

35. During the time that Plaintiff worked for Pile, Plaintiff claims the barge was moved every 3 or 4 days.  **Ex. G**, Daza Dep., p. 235.  It would typically take between 25 minutes and 2 hours to move the barge.  **Ex. G**, Daza Dep., p. 235.  Plaintiff's work day was typically 8

hours. **Ex. G**, Daza Dep., p. 235. Thus, at most, 4 hours of his typical 40 hour work week would involve moving the barge.

36. No one slept on the crane barges. **Ex. G**, Daza Dep., p. 26.

37. Plaintiff claims he was sometimes referred to as a "deckhand." **Ex. G**, Daza Dep., p. 15. However, Plaintiff admits that his union never identified him as a deckhand; he was never hired by any employer as a deckhand; he never trained as a deckhand; and no written document ever identified him as a deckhand. **Ex. G**, Daza Dep., pp. 15- 16.

38. Plaintiff is not aware of any positions available through his Union for "able-bodied seaman," "deckhand," or "chief mate." **Ex. G**, Daza Dep., p. 51. Plaintiff is not aware of any classes offered by the union for seamen safety or seamanship, nor did he ever take a course regarding seamanship or line handling. **Ex. G**, Daza Dep., pp. 38, 52.

39. Plaintiff does not hold any Coast Guard licenses or a Z Card. **Ex. G**, Daza Dep., p. 18, 62.

40. Plaintiff is unfamiliar with maritime terms such as "AB" and "boatswain." **Ex. G**, Daza Dep., p. 118.

41. Plaintiff testified that he learned the meanings of port and starboard and bow and stern by looking it up on the Internet, claiming it was a requirement for his job. However, he admits that he was never tested on these terms and that no one ever told him he needed to know them for the job. **Ex. G**, Daza Dep., pp. 27-28. Plaintiff also admits that he could not tell which end of the UNCLE LEO was the bow and which was the stern. **Ex. G**, Daza Dep., p. 94.

42. Plaintiff's duties at the EIC job in Queens were similar to those he performed while working for Pile. **Ex. G**, Daza Dep., p. 48. That site was only a quarter of a mile long and

when the barge was moved, it was typically only one barge length at a time. **Ex. G**, Daza Dep., p. 41, 45.

43. Although Plaintiff claims that at the EIC job, he would sometimes go on board the tug that moved the barges to assist with tying lines, the tug used at the Queens job was owned and operated by EIC, not Pile or Seawolf Marine. **Ex. G**, Daza Dep., p. 42. Moreover, the EIC job was separate and distinct from this Project and had nothing to do with the Project where Plaintiff was injured.

44. The furthest distance that Plaintiff traveled on a crane barge was from Manhattan to Queens, which occurred at most two times: once to take the barge to the job in Queens where Plaintiff worked for EIC, and once to return the barge to the East River Park in Manhattan. **Ex. G**, Daza Dep., pp. 43-44.

## DETAILS OF THE ACCIDENT

45. The day before the accident, Plaintiff returned to work for Pile as a dockbuilder on the Project with the same duties that he previously had. **Ex. G**, Daza Dep., p. 49; **Ex. H**, Nee Dep., p. 50.

46. On the day of Plaintiff's accident, the UNCLE LEO was moored with spuds in the East River at a bulkhead located in an area referred to as the "EDC Lot," which is adjacent to the south end of the Project used by Pile for staging materials. **Ex. G**, Daza Dep., 53-54, 57-58, 61, 81, 119; **Ex. H**, Nee Dep., pp. 43-44, 85-86.

47. A gangway provided access to the UNCLE LEO from land, allowing workers to walk freely on and off the barge. **Ex. G**, Daza Dep., p. 90; **Ex. H**, Nee Dep., p. 47.

48. At the direction of Nee, Plaintiff and other Pile employees set out to rig a new cable on one of the cranes located on the UNCLE LEO; a longer cable was needed to hoist construction materials. **Ex. G**, Daza Dep., pp. 78-79; **Ex. H**, Nee Dep., p. 45.

49. This activity had nothing to do with moving the barge and was performed exclusively to facilitate performance of construction activities. **Ex. G**, Daza Dep., p. 119.

50. After removing the old cable from the crane and the crane block, which had been placed down flat on its side on the deck of the barge the night before, the crane block was hoisted by the crane and set down upright in the center of the barge, wedged between two crane mats, at the direction of Pile's Foreman, Nee. **Ex. G**, Daza Dep., pp. 92-93, 105-110; **Ex. H**, Nee Dep., pp. 62-64.

51. The crane block is a very heavy steel block that stands approximately six feet high and is used with a crane for hoisting construction materials and equipment. **Ex. H**, Nee Dep., p. 58.

52. As Plaintiff was walking around the crane block, the block fell over striking Plaintiff's lower left leg, calf, and ankle. **Ex. G**, Daza Dep., p. 110.

53. Plaintiff was standing on top of the wooden crane mats at the time, rather than directly on the deck of the barge. **Ex. H**, Nee Dep., p. 88.

54. No cable was though the block when it fell, but a shackle was connected to a choker chain, which was connected to the boom of the crane. **Ex. H**, Nee Dep., p. 65-66.

55. The block had been in place for 5 to 10 minutes before it fell and no one was touching it at the time. **Ex. G**, Daza Dep., p. 112; **Ex. H**, Nee Dep., p. 98.

374212.2

56.     Plaintiff did not know what caused the crane block to fall; he did not feel the barge move at or immediately before it fell; he did not believe that wakes or waves caused the block to fall; and he was not aware of any defect in the wooden mat or deck of the barge that might have caused the block to fall.  **Ex. G**, Daza Dep., pp. 111-12, 115-116, 201-202.

57.     Similarly, Nee did not recall any wakes in the area at the time the block fell.  **Ex. H**, Nee Dep., p. 71.

58.     Wakes from vessels passing in the East River did cause the UNCLE LEO to move up and down.  **Ex. G**, Daza Dep., p. 89; **Ex. H**, Nee Dep., p. 33.  However, on the day of the accident the water was very calm.  **Ex. G**, Daza Dep., p. 102.

59.     Plaintiff claims that the method used that day to rig the crane block was different from the method Pile normally used.  **Ex. G**, Daza Dep., p. 113.  Specifically, Plaintiff stated that the block was usually laid down flat on its side, rather than upright, when a new cable was thread through the block.  **Ex. G**, Daza Dep., p. 114.  He did not know why it was done differently on that day.  **Ex. G**, Daza Dep., p. 114.

60.     Critically, Nee testified that he had performed the same task 10 to 12 times while working for Pile and that, in the past, the task had been performed both on barges and on land.  **Ex. H**, Nee Dep., pp 53-55.

61.     The work being performed aboard the UNCLE LEO on the day of the accident was undeniably construction related activity.

## PILE'S CONTRACTUAL OBLIGATION

62. Pile's legal obligations to the City for matters relating to the Project are governed by the City/Pile Contract. **Ex. J**.

63. The City also entered into a contract with the predecessor of URS for the performance of certain work on the East River Park Project ("the City/URS Contract"). A copy relevant excerpts of the City/URS Contract are attached to the Karpousis Aff. as **Exhibit K.**

64. URS likewise subcontracted with an entity currently known as AECOM for services pertaining to the Project ("the URS/AECOM Contract"). A copy of the URS/AECOM Contract is attached to the Karpousis Aff. as **Exhibit L.**

65. Pile is not a party to either the City/URS Contract or the URS/AECOM Contract and has no contractual privity with either URS or AECOM. **Exs. J, K, and L.**

66. The City/Pile Contract contained, *inter alia*, indemnity provisions and insurance requirements running in favor of the City. **Ex. J, p. 45.**

67. Pile is the "Contractor" as defined by the City/Pile Contract. **Ex. J**, p. 41, Clause 2.1.11.

68. The City/Pile Contract is governed by New York Law. **Ex. J**, p. 95, Clause 65.1

69. The City/Pile Contract includes an indemnification provision which covers injury to any person "arising from or in any way related to" the work performed by Pile on the Contract. **Ex. J**, p. 45, Clause 7.4.

70. The City/Pile Contract prohibits third-parties, such as URS or AECOM, from claiming any rights against Pile arising under the contract. **Ex. J**, p. 45, Clause 7.6.

71.     The City/Pile Contract also requires Pile to obtain General Liability Insurance, which names the City as an additional assured and provides coverage for the liability assumed by Pile under the indemnity provisions of the Contract.  **Ex. J**, p. 57, Clause 22.1.1.

72.     Pile purchased the requisite Commercial General Liability ("CGL") coverage with Valiant Insurance Company ("Valiant"), as per Section 22.1.1 of the City/Pile Contract, naming the City as an Additional Insured.  A copy of the Valiant CGL Policy is attached to the Karpousis Aff. as **Exhibit M**.

73.     All City entities named in this lawsuit (the City of New York, the New York City Department of Parks and Recreation Capital Projects Division, and the New York City Economic Development Corporation) are being defended against all claims asserted in this case against them by Pile's insurer, Valiant, under the Valiant Policy purchased by Pile in compliance with its insurance and indemnity obligations under the City/Pile Contract.   A copy of Valiant's coverage letter addressed to the City of New York is attached to the Karpousis Aff. as **Exhibit N**.

74.     The Jones Act and LHWCA claims asserted against Pile in this case are covered by Pile's "employer's liability" carrier, the New York State Insurance Fund ("NYSIF").  A copy of the NYSIF's coverage letter is attached to the Karpousis Aff. as **Exhibit P**.

75.     The NYSIF Policy does not cover liability assumed by contract, such as the contractual cross-claims asserted herein by the City against Pile.  **Ex. P**.

76.     Whereas the Valiant Policy does provide coverage for liability arising out of contract.  **Ex. M**, Valiant Policy**,** CG 00 01 10 01.

Dated: New York, New York
September 27, 2011

        **General Attorney:**

        Gregory J. Allen
        New York State Insurance Fund

        **Trial Counsel:**

        FREEHILL HOGAN & MAHAR LLP
        Attorneys for Defendants
        Pile Foundation Construction Company, Inc.
        and the Barge UNCLE LEO

By:   <u>s/ John F. Karpousis</u>
        John F. Karpousis
        Carolyn Elizabeth Bundy
        80 Pine Street
        New York, New York 10005-1759
        (212) 425-1900