FRIEDMAN, JAMES & BUCHSBAUM LLP
Andrew V. Buchsbaum, Esq. (AB-6475)
Attorneys for Plaintiff
132 Nassau Street, Suite 900
New York, NY   10038
telephone: (212) 233-9385

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x

| | | |
|---|---|---|
| JON DAZA, | : | 10 Civ. 4678 (MGC)(GWG) |
| Plaintiff, | : | |
| -against- | : | **PLAINTIFF'S** |
| | | **LOCAL CIVIL** |
| PILE FOUNDATION CONSTRUCTION | : | **RULE 56.1 STATEMENT** |
| COMPANY, INC., URS CORPORATION, | | |
| URS CORPORATION-NEW YORK, | : | |
| THE CITY OF NEW YORK, THE NEW YORK | | |
| CITY DEPARTMENT OF PARKS AND | : | |
| RECREATION, THE NEW YORK CITY | | |
| DEPARTMENT OF PARKS AND RECREATION | : | |
| CAPITAL PROJECTS DIVISION, THE | | |
| NEW YORK CITY ECONOMIC DEVELOPMENT | : | |
| CORPORATION, AECOM SERVICES, INC, | | |
| AECOM USA, INC. and the Barge "UNCLE LEO,": | | |
| its equipment, tackle and appurtenances, *in rem*, | | |
| | : | |
| Defendants. | | |

-------------------------------------------------------------x

Plaintiff, Jon Daza, by his attorneys, FRIEDMAN, JAMES & BUCHSBAUM LLP,

for his Local Rule 56.1 Statement, hereby contends that as to the following material facts, there are

no issues to be tried:

A.    **The Parties:**

1.    Plaintiff Jon Daza, a citizen of the State of New Jersey, was born on

November 3, 1987.  Deposition of Jon Daza ("Daza Dep.") at 8, annexed as Exhibit 8 to the

Declaration of Andrew V. Buchsbaum dated September 27, 2011 ("Buchsbaum Dec.").

2.      On May 20, 2010, plaintiff was employed by defendant Pile Foundation Construction Company ("Pile") as a dockbuilder/deckhand.  Daza Dep. at 15 (Ex. 8).

3.      Pile was and still is a corporation organized and existing pursuant to the laws of the State of New York with its office and principal place of business located in New York. Second Amended Complaint at ¶ 6; Pile Answer to Second Amended Complaint at ¶ 6.

4.      Defendant URS Corporation ("URS") was and still is a corporation organized and existing pursuant to the laws of the State of Nevada with its principal place of business located in California.  Second Amended Complaint at ¶ 8; URS Answer to Second Amended Complaint at ¶ 8;  Deposition of Matthew Barba ("Barba Dep.") at 11 (Ex. 10).

5.      Defendant URS Corporation-New York ("URS-New York") was and still is a corporation organized and existing pursuant to the laws of the State of New York with is principal place of business located in New York or California.  (URS and URS-New York are sometimes collectively referred to as "URS").  Second Amended Complaint at ¶ 9; URS Answer to Second Amended Complaint at ¶ 9; Barba Dep. at 11 (Ex. 10).

6.       Defendants the City of New York, the New York City Department of Parks and Recreation and the New York City Department of Parks and Recreation Capital Projects Division (collectively the "City") were and still are municipal corporation or departments of the City of New York organized and existing under and by virtue of the laws of the State of New York.  City Answer.

7.      Defendant The New York City Economic Development Corporation ("EDC") was and still is a non-profit development corporation organized and existing under and by virtue of the laws of the State of New York.  City Answer.

2

8.     Defendant Aecom Services, Inc. ("Aecom") was and still is a corporation organized and existing pursuant to the laws of the State of California with its office and principal place of business located outside New Jersey.  Aecom Answer at ¶ 8 (docket no. 49).

9.     Defendant Aecom USA, Inc. ("Aecom USA") was and still is a corporation organized and existing pursuant to the laws of the State of  New York with its office and principal place of business located outside New Jersey (Aecom and Aecom USA are sometimes collectively referred to as "Aecom").  Aecom Answer at ¶ 9 (docket no. 49).

**B.     <u>The East River Park Project</u>:**

10.     Pile was the successful bidder on Contract No. M144-101M, a $54 million project awarded to Pile by defendant the New York City Department of Parks & Recreation Capital Projects Division.  City-Pile contract No. M-144-101M excerpts (Ex. 13).

11.     The contract entailed "furnishing all labor, materials & equipment, together with all work incidental thereto, necessary or required for the reconstruction of the bulkheads and relieving platforms from Jackson Street to East 14th Street, between the FDR Drive and East River, in East River Park, in the Borough of Manhattan, known as Contract Number M144-101M (the "East River Park project" or "project").  City-Pile Contract No. M-144-101M excerpts (Ex. 13).

12.     City employee Mohamed Ayoub was the City's Resident Engineer at the project.  He attended on site every day, all day, directing work and was the City's on-site representative at the project.  He has a masters degree in mechanical  engineering.  Deposition of Mohamed Ayoub ("Ayoub Dep.") at 6-9, 18-20, 31 (Ex. 11); Deposition of Brian Nee ("Nee Dep.") at 74, 100-01, 105 (Ex. 9); Barba Dep. at 28 (Ex. 10).

3

13.     In sum, the East River Park project included demolition and reconstruction of the water front promenade/pier between 14th and Jackson St. in the Borough of Manhattan.  City-Pile Contract No. M-144-101M (Ex. 13);  Nee Dep. at 11-12 (Ex. 9); Declaration of Stuart Sokoloff, P.E. dated September 22, 2011 ("Sokoloff Dec.").

14.     URS and URS-New York, as successors to O'Brien Kreitzberg, were awarded Contract No. CNYG-2800M by the City.   URS Answer to Second Amended Complaint at ¶38 (docket no. 37); City-URS Contract excerpts (Ex. 15); Barba Dep. at 8, 57 (Ex. 10).

15.     URS subcontracted with DMJM + Harris, Inc. (now defendant Aecom-USA) to provide construction management services for the project.  Aecom Answer to Second Amended Complaint at ¶¶ 15, 38 (docket no. 49); URS-Aecom subcontract (Ex. 16); Deposition of Anibal Esteves (Steve) Santos ("Santos Dep.") at 8, 21 (Ex. 12).

16.     The pilings supporting the East River Park promenade, and the promenade itself, extend into the East River.  Accordingly, crane barge access from the East River was both practical and necessary to accomplish the work, and was therefore typical for these types of projects and a necessary part of the work. Ayoub Dep. at 21 (Ex. 11); Sokoloff Dec. at 5.

17.     Property known as the EDC [Economic Development Corporation] Lot is adjacent to the project and was regularly used by Pile to store supplies, equipment and materials, and to load supplies, equipment and materials onto barges.  Nee Dep. at 15, 85-87 (Ex. 9); Barba Dep. at 22-23 (Ex. 10); maps (Ex. 3).

18.     The EDC Lot extends from approximately Montgomery Street to Jackson Street between the FDR Drive and the East River and is landward of Pier 42, which extends on pilings into the East River. Maps (Ex. 3); Barba Dep. at 21 (Ex. 10).

4

19.     The EDC lot also was used as the entrance to the project.  Nee Dep. at 91-92 (Ex. 9).

**C.     The Accident:**

20.     On May 20, 2010, plaintiff was part of a Pile crew attempting to replace the main lifting cable on a Manitowoc 4100 crane (the "crane") on the steel barge "Uncle Leo" (the "barge").  Daza Dep at 21, 78 -79, 119, 126 (Ex. 8); Nee Dep. at 11, 35, 43-44 (Ex. 9); City Employee Daily Sign-In Log (Ex. 7).

21.     The crane was then to load pre-cast concrete onto the barge for use in construction activities on the project.  Daza Dep. at 21, 78-79, 119, 126 (Ex. 8); Nee Dep. at 11, 35, 87-88 (Ex. 9); City Employee Daily Sign-In Log (Ex. 7).

22.     Brian Nee was the Pile foreman in charge of the job.  Nee Dep. at 8, 45, 77 (Ex. 9).

23.     The barge, approximately 300 ft. x 60 ft., was floating, spudded in the East River 60-80 feet off a bulkhead adjacent to the EDC Lot and attached to 2 other barges landward and abutting the bulkhead.  Photographs (Ex. 2); Daza Dep. at 60, 80, 81, 84, 88, 98 (Ex. 8); Nee Dep. at 35-36, 47 (Ex. 9); Sokoloff Dec. at 6-7.

24.     Approximately 70-80% of the barge deck was covered with timber crane mats-- four or five 12 inch square timbers, 12-15 ft. long and bolted together– which formed a platform12 inches above the barge deck upon which the crane traveled.  Photographs (Ex. 2); diagrams (Ex. 1); Daza Dep. at 83, 181 (Ex. 8); Nee Dep. at 21-23, 88 (Ex. 9); Sokoloff Dec. at 6-7.

25.     The barge deck itself was elevated approximately 12 feet above the East River.  Nee Dep. at 21 (Ex. 9); Sokoloff Dec. at 7; photographs (Ex. 2).

5

26.     The crane was resting on top of the timber mats, situated towards the barge's north end.  Daza Dep. at 98-100 (Ex. 8); Sokoloff Dec. at 7; Declaration of Larry D. DeMark, Sr. dated September 22, 2011 ("DeMark Dec.") at 2.

27.     The crane's boom was approximately 150 ft. long, with the cable fed from a spool at the crane along the boom and then draped vertically downward, attached to a "block" at the cable's end.   Photographs (Ex. 2); Sokoloff Dec. at 8; DeMark Dec. at 2.

28.     To replace the cable, the old cable and crane block first had to be removed from the crane.  Daza Dep. at 92-94 (Ex. 8); Nee Dep. at 53, 56 (Ex. 9).

29.     The "block" is hardened steel and consists of three (3) main components: the five sheaves (or pulleys) at top around which the cable is wound; a middle swivel portion; and a lower shackle.  Equipment or materials to be raised or lowered can be attached directly to the shackle or to a wire rope wrapped around the shackle.  Photographs (Ex. 2); diagrams (Ex. 1); Nee Dep. at 57-62 (Ex. 9); Sokoloff Dec. at 8-9; DeMark Dec.

30.     The block is approximately 79 inches long, 20 inches wide at the sheaves, and 21 inches wide at the shackle.  Photographs (Ex. 2); diagrams (Ex. 1); Sokoloff Dec. at 7-8; DeMark Dec.; Daza Dep. at 191 (as corrected) (Ex. 8); Nee Dep. at 57-62 (Ex. 9).

31.     The steel shackle is 26 inches long from the pin to its tip, 21 inches at its widest, and shaped like a "U' or loop, with a 5 1/2 inch diameter.  The maximum opening of the shackle is approximately 10 inches.  Photographs (Ex. 2); diagrams (Ex. 1); Sokoloff Dec. at 7-8; DeMark Dec.

32.     The entire block weighed between 2065 and 5375 pounds. Photographs (Ex. 2); Sokoloff Dec. at 7-9; DeMark Dec.; Daza Dep. at 202 (Ex. 8); Nee Dep. at 57-62 (Ex. 9).

33.     The block was first laid horizontally <u>on</u> <u>its</u> <u>side</u>, directly on the barge deck, by the crane operator, where plaintiff and other workers removed the old crane cable from the block. Daza Dep. at 101-03 (Ex. 8); Nee Dep. at 81, 96 (Ex. 9).

34.     After removal of the old crane cable from the block, the crane operator, at Nee's direction, attached straps to the block and swung it over into an elevated <u>vertical</u> position to the elevated crane mats, where the new cable was to be installed.  Daza Dep. at 105-06 (Ex. 8); Nee Dep. at 96 (Ex. 9).

35.     The block was thus raised from a flat horizontal position to an elevated vertical position.  Daza Dep. at 105-06 (Ex. 8); Nee Dep. at 96 (Ex.9); diagrams (Ex. 2).

36.     The shackle at the bottom of the block became wedged in a <u>vertical</u> position in a three inch gap in the crane mat.  Diagrams (Ex. 2); Daza Dep. at 105-07, 114, 180, 211 (Ex. 8); Nee Dep. at 63-65, 96-97 (Ex. 9); Sokoloff Dec.; DeMark Dec.

37.     The 3 inch gap between the mats did not expand when the block was wedged between the crane mats.   Nee Dep. at 65 (Ex. 9); Sokoloff Dec. at 11; DeMark Dec.

38.     A shackle was placed into one of the holes in the top of the crane block, approximately 6.5 feet above the deck, and a choker connected the shackle to the crane boom. Diagrams (Ex. 2); Nee Dep. at 65-66 (Ex. 9); Sokoloff Dec. at 11; DeMark Dec.

39.     As plaintiff was walking to get cable or straps to secure the block, it fell approximately 6.5 feet to the barge deck, with the upper sheave portion striking plaintiff's left ankle and crushing it through the 12 inch crane mats, crushing plaintiff's ankle against the barge deck. Diagrams (Ex. 1); photographs (Ex. 2); Daza Dep. at 110-12, 181 (Ex. 8); Nee Dep. at 69-71, 98 (Ex. 9); Sokoloff Dec. at 10-13; DeMark Dec.; Accident Reports (Exs. 5-7).

7

40.     Before it fell, the block had remained in its unsecured, vertical position for approximately 5-10 minutes.  Nee Dep. at 98 (Ex. 9).

41.     No one touched or moved the block before it fell.  Daza Dep. at 111-12 (Ex. 8); Nee Dep. at 70-71, 98-105 (Ex. 9).

42.     Before the block fell, plaintiff believed the bottom of the block was above the barge deck.  Daza Dep. at 110 (Ex. 8).

43.     This is confirmed by plaintiff's expert engineer Sokoloff, who, based on his on-board inspection and measurement of the crane block, believes, based upon the 5 ½ inch diameter of the block shackle ring, that the bottom of the block was elevated above the barge deck before it fell.  Sokoloff Dec. at 14-15; Diagrams (Ex. 1); photographs (Ex. 2); DeMark Dec.

44.     According to Sokoloff, the only way the block shackle could have contacted the barge deck before it fell is if the crane mat gap was wider than 3 inches.  If this were so, there would not have been a frictional or confining/clamping force for the block to remain vertical for the 5-10 minutes before it fell.  If the block rested on the curved bottom portion of the shackle on deck, it would have been unstable and fallen immediately. Without a frictional/clamping force from the mats, the block would have been free to rotate in any direction (360 degrees) when acted upon by gravity.  Sokoloff Dec. at 14-15.

45.     The block was unsecured and free-standing and elevated above the barge deck before it fell.  Diagrams (Ex. 1); Daza Dep. at 107-110 (Ex. 8); Sokoloff Dec. at 13-14; DeMark Dec.

46.     The shackle is curved at its lowest point, therefore the vertically rigid/"frozen" block is unstable if placed on either the timber mats or barge deck, and would roll to one side or the

8

other as its weight is pulled by gravity. Wedging the block's shackle between two timber mats was unsafe, unstable, an insufficient means to support the block and posed an imminent and foreseeable danger to plaintiff and other workers.  Diagrams (Ex. 1); photographs (Ex. 2); Sokoloff Dec. at 15-16; DeMark Dec.

47.     There was an approximate 7.0 to 7.58 ft. elevation differential between the top of the unsecured block in its vertical position and the barge deck where plaintiff's ankle was crushed.  Diagrams (Ex. 2) Sokoloff Dec. at 13; DeMark Dec.; photographs (Ex. 2).

48.     The force generated by the falling 1-2 ton block was sufficient to crush plaintiff's ankle through the crane mats and against the barge deck.  Sokoloff Dec. at 15.

49.     Blocks, stays, slings or hangers should have been used to properly secure the block during re-cabling to avoid injuring plaintiff.  Sokoloff Dec. at 13-14; DeMark Dec.; photographs (Ex. 2); diagrams (Ex. 1).

50.     The injury to Daza was the direct consequence of application of the force of gravity to the unsecured block, which caused it to fall and injure plaintiff.  Sokoloff Dec. at 14; DeMark Dec.; diagrams (Ex. 1); photographs (Ex. 2).

51.     The timber mats were in a dangerous condition and should not have had gaps between them which created a danger to workers and a trap like condition.  Sokoloff Dec. at 16.

52.     The mats provided a dangerous and defective platform for the crane block to be situated upon.  If the mats had been sound and un-damaged, they would have neatly abutted one another and there would not have been the gap between mats into which the block's shackle could have been placed and the accident would not have occurred.  Sokoloff Dec. at 16; DeMark Dec; diagrams (Ex. 1); photographs (Ex. 2).

53.     By 1:00 p.m. that day, the barge had already sailed a short distance back to East River Park and resumed construction activities.  Ayoub Dep. at 49-51 (Ex. 11); City Resident Engineer's Daily Report (Ex. 19 at URS 942).

54.     There was <u>no</u> other location from which to load supplies, materials and/or equipment onto barges other than the bulkhead located adjacent to the EDC lot.  Barba Dep. at 45 (Ex. 10); Santos Dep. at 38-39 (Ex. 12); Ayoub Dep. at 37-39, 43 (Ex. 11).

55.     The barge was not in the EDC Lot, but rather in the navigable waters of the East River at the time of incident.  Ayoub Dep. at 37-39, 43 (Ex. 11).

56.     Neither the City nor any other individual or entity (other than the United States Coast Guard) had the authority to restrict the barge's presence in the East River.  Ayoub Dep. at 45 (Ex. 11).

57.     None of the notices from the City specifically referenced removal of Pile barges from the bulkhead.  Ex. 18; Ex. 20.; Ayoub Dep. at 45-49 (Ex. 11).  Moreover, Pile was entitled to use the north end of the EDC lot, which included the bulkhead.  Ex. 20; Ex. 18; Sokoloff Dec. at 17-18.

58.     Once the EDC Lot issue was deemed "closed" as of March 25, 2010, barges continued to be moored adjacent to the bulkhead.  URS Minutes to Progress Meeting #110 (Ex. 18 at URS 612); Barba Dep. at 52-53 (Ex. 10).

59.     Pile was specifically allowed to use the EDC lot to receive a May 10, 2010 delivery of pre-cast concrete.  URS Minutes to Progress Meeting # 112 (Ex. 18 at URS 620).

60.     The adjacent EDC Lot**,** its adjoining bulkhead and the barge were all considered part of the construction site as per the language of the City of New York Parks and

Recreation Standard Construction Contract & General Conditions ("City Standard Construction contract"), which state in part:

> 2.1.28 "Site" shall mean the area upon or in which the contractor's operations are carried on, and such other areas **adjacent thereto** as may be designated as such by the Engineer."

(emphasis added) (Ex. 14 at URS 7).

61.    The URS Incident/Near Miss Report Form states that the accident occurred "on a barge moored in the East River located along a lot **adjacent** to the project site . . . ." (emphasis added) (Ex. 5).

62.    The City Incident Report states the incident occurred "on a barge berthed in East River **adjacent to** a lot containing Pier 42 owned/operated by the NY Economic Development Corp.  **Next to the jobsite**."  (emphasis added) (Ex. 6).

63.    Barba admitted that the EDC lot was "adjacent" to the site pursuant to the contractual definition of "site."  Barba Dep. at 27 (Ex. 10).

64.    The City, URS and AECOM all were fully aware that Pile was using the bulkhead adjacent to the EDC Lot to load equipment and materials onto barges, and that there was no other location where such loading onto barges could occur.  Nee Dep. at 104-05 (Ex. 9); Santos Dep. at 45, 52-53 (Ex. 12); Barba Dep. at 30-31 (Ex. 10).

65.    There was nothing that prohibited Pile from stationing the barge where it was located at the time of plaintiff's accident.  Santos Dep. at 41  (12).

**D.    The Role of URS:**

66.    URS, which contracted with the City for construction management services, is a design engineering firm with over 40,000 employees world-wide with its own safety division.

Barba Dep. at 11, 57, 80 (Ex. 10).

67.     Since 2000, Matt Barba has been employed by URS as Project Manager at the site, where he reported daily to an office shared with Santos, Ayoub and Carla Martins, another URS employee. Barba Dep. at 6-9, 11-14 (Ex. 10); Santos Dep. at 14-15 (Ex. 12).

68.     Barba reported directly to Mohamed Ayoub, the City Resident Engineer. Barba Dep. at 12 (Ex. 10); Ayoub Dep. at 15 (Ex. 11).

69.     Barba has a degree in ornamental horticulture and landscape architecture from SUNY Farmingdale. Barba Dep. at 6-9 , 11 (Ex. 10).

70.     Barba walked the site every day and occasionally boarded Pile barges to take photographs. Nee Dep. at 9 (Ex. 9); Barba Dep. at 77 (Ex. 10).

71.     Barba was the "eyes and ears" of the City on the site. Barba Dep. at 96 (Ex. 10).

72.     Pursuant to the City-URS Contract an explicit agency relationship was established as follows:

> The Consultant [URS] **shall be the representative of the Agency at the site** . . .

URS-City Contract at Part II Article 1(B) (Ex. 15 at URS 382); Ayoub Dep. at 32 (Ex. 11).

73.     The fiduciary relationship between the City and URS was specifically recognized in the City-URS contract:

> Consultant [URS] recognizes the necessity of a close working relationship with owner [the City] and agrees to furnish the skill and judgment of its organization in the performance of this Agreement; to provide Consultant's best efforts, knowledge, ideas, experience and abilities relating to the planning of the construction of the Project; . . . .

12

URS-City contract at Part II Article 2(A) (Ex. 15 at URS 382).

74.     Barba had authority to complete, and did complete, the official City Incident Report regarding plaintiff's accident on a City form.  City Incident Report (Ex. 6); Ayoub Dep. at 25-27 (Ex. 11).

75.     URS hired Construction and Realty Safety Group, Inc. to conduct safety inspections.  These inspections covered activities and conditions on Pile cranes and barges and Barba attended these safety inspections with Santos.  See, e.g., Site Safety Supervisors Log (Ex. 17) at URS 475 (URS listed as "client"); URS 477 (crane inspection);  URS 485 (barge); URS 541 ("SSM walked entire site with Steve Santos"); URS 548 ("SSM walked entire site with Steve Santos and Matt Barba"); see also Barba Dep. at 58-61 (Ex. 10).

76.     URS also had broad supervisory powers:

•Consultant [URS] recognizes the necessity of a **close working relationship with owner** and agrees: . . . to furnish business administration, consultation, **superintendence**, **inspection and related services** as required to monitor the work of the contractors and to **supervise** the coordination of the activities of each Contractor with each other and with the activities and responsibilities of Owner and Architect.

City-URS contract at Part II Article 2(A) (emphasis added) (Ex. 15 at URS 382).

77.     If Pile's means and methods created a safety hazard to workers, URS had the contractual authority to report this to the City by way of a "stop work order" and "recommend" that the work be stopped:

•It is the responsibility of the construction contractor, and not the responsibility of the Consultant, to determine the Means and Methods of Construction, as defined in Article 2, Paragraph 16 of the Agreement Section of the construction contract documents. **However, if the means and methods of construction proposed by the construction contractor will constitute or create a hazard to the work, or to persons or property, or will not produce finished work in accordance with the**

> **terms of the construction contract, such means and methods must be reported to the Commissioner prior to the implementation of same at the construction site.**

City-URS Contract at Part II Article 1(D) (emphasis added) (Ex. 15 at URS 382); Barba Dep. at 17, 55. 86, 91-94 (Ex. 10).

78.     If then directed by the City, URS would ensure that work stopped.  Barba Dep. at 91-95 (Ex. 10).

79.     Article 2(C)(19) of the City-URS contract reiterated URS's supervisory function and ability to request work be stopped for any "applicable reason:"

> 19.  Provide resident, consulting services by a competent staff from the date construction commences to the completion of the Contractor's operation and the acceptance of the work by the Owner, including the following:
>
> \*                    \*                    \*
>
> c.     Monitor the work of each Contractor and recommend courses of action to non-resident Consultant personnel who shall recommend to Owner when a Contractor is not fulfilling its obligations or when other circumstances develop which adversely affect (or threat to affect) the Work and/or the progress thereof.  To this end, Consultant shall advise Owner promptly, based upon Consultant's knowledge, information, and field observation:
>
> \*                    \*                    \*
>
> (ii) **to stop the Work** (or any portion thereof) of any Contractor or other firm, for any period necessary, whether for inspection and testing, correction of the Work, **emergency or for any other applicable reason.**

City-URS contract at Part II Article 2(C)(19) (emphasis added) (Ex. 15 at 385-86).

80.     The City-URS contract also makes direct reference to and incorporates provisions of the City Standard Construction Contract.  Barba Dep. at 69-71 (Ex. 10).

14

81.    Part II Article 1(B) of the City-URS contract incorporates Article 32 of the

Standard Construction Contract:

> •The Consultant [URS] **shall be the representative of the Agency at the site** and, subject to review by the commissioner or his duly authorized representative, **shall have the power, in the first instance, to inspect the performance of the work, as delineated in "Article 30-The Resident Engineer" of the Agreement Section of the Standard Department of Parks and Recreation construction contract** documents.

City-URS Contract at Part II Article 1(B) (emphasis added) (Ex. 15 at URS 382).

82.    This reference to Article 30 of the City Standard Construction Contract is a

typographical error, as Article 30 refers to "Notice and Documentation of Costs and Damages;

Production of Financial Records."  Rather, Article 31 of the City Standard Construction Contract

refers to "The Resident Engineer."  See City Standard Contract at 70-71 (Ex. 14 at URS 35-36).

83.    Article 31 of the City Standard Construction Contract states as follows:

> The Resident Engineer shall have the power to **inspect, supervise and control** the performance of the **Work**, subject to review by the Commissioner.

City Standard Construction Contract at Article 31 (Ex. 14 at URS 36).

84.    URS was both "Engineer" and "Resident Engineer" on the project pursuant

to the City Standard Construction Contract.

85.    "Work" as defined in the City Standard Construction Contract included the

crane block:  "all services required to complete the Project in accordance with the Contract

Documents, including without limitation, labor, material, superintendence, management,

administration, **equipment**, and incidentals, and shall include both contract work and Extra Work."

City Standard Construction Contract at Article 2.1.33 (emphasis added) (Ex. 14 at URS 8).

15

Case 1:10-cv-04678-MGC   Document 100   Filed 09/27/11   Page 16 of 21

86.    URS, as Engineer on the East River Park project, also had the right to reject "Means and Methods of Construction" which "will constitute or create a hazard to the Work, or to persons or property." City Standard Construction Contract at Article 4.1 (Ex. 14 at URS 43).

87.    "Means and Methods of Construction" is "the labor, materials, temporary structures, tools, plant and construction equipment, and the manner and time of their use, necessary to accomplish the result intended by this Contract." City Standard Construction Contract at Article 2.1.21 (Ex. 14 at URS 7).

88.    "Engineer" is defined in the City Standard Construction Contract as "the person so designated in writing by the Commissioner to act as such in relation to this Contract, including a private Architect or Engineer or Project Manager, as the case may be" and includes Barba. City Standard Construction Contract at Article 2.1.13 (Ex. 14 at URS 6).

89.    URS had the contractual right to reject the obviously dangerous procedure used to re-rig the crane block.

90.    URS also had explicit contractual authority to board Pile's barges, as follows:

> During the progress of the Work and up to the date of Final Acceptance, the Contractor shall at all times afford the representatives of the City every reasonable, safe and proper facility for inspecting all Work done or being done at the Site and also for inspecting the manufacture or preparation of materials and equipment at such place of such manufacture or preparation.

City Standard Construction Contract at Article 6.1 (Ex. 14 at URS 9); Barba Dep. at 97 (confirming that URS could board barges as part of its responsibilities) (Ex. 10).

91.    URS conducted a detailed investigation of plaintiff's accident, which included corresponding with OSHA, and Barba prepared a comprehensive report for URS.    URS

16

Incident/Near Miss Report (Ex. 5); Barba Dep. at 63-68, 76, 82-83 (Ex. 10).

**E.     The Role of Aecom:**

      92.     The URS-Aecom subcontract explicitly authorizes Aecom to "recognize,

evaluate and correct all safety hazards/deficiencies" and to issue stop work orders:

> Article 7–Health and Safety

>            *                       *                    *

> **C.     Elimination of Hazards/Stop Work Orders:**

> The subconsultant [Aecom] specifically acknowledges that it has **the primary responsibility to recognize, evaluate and correct all safety hazards/deficiencies** due to its operations/activities and for which it is responsible. **The subconsultant further specifically acknowledges that it (and its officers, employees, agents, and representatives) has special expertise in the recognition and prevention of such hazards/deficiencies in its operations/activities and that URS does not have such expertise and is relying upon such expertise by the Subconsultant (emphasis added)**.

URS-Aecom sub-contract at Article 7(C) (emphasis added) (Ex. 16 at URS 466).

      93.     Aecom's authority extended to "marine related portions of the construction

activities . . . ." URS-Aecom subcontract at Exhibit A (Ex. 16 at URS 471).

      94.     Steve Santos, a licensed professional engineer with marine construction

experience, was employed at the site since 2005 by Aecom, a New York Stock Exchange registered

company with over 40,000 employees. Santos Dep. at 9 (Ex. 12).

      95.     Santos has a bachelors in civil engineering and M.B.A. from the University

of Connecticut. Santos Dep. at 6 (Ex. 12).

      96.     Santos was both "Resident Engineer" and "Engineer" on the East River Park

project pursuant to the City Standard Construction Project. Santos Dep. at 22 (Ex. 12); Ayoub Dep.

at 17 (Ex. 11); Ex. 14.

97.     Santos prepared and signed the City's Resident Engineer's Daily Reports on official City forms provided to him by URS, detailing the work, including barge movements and activities, which Barba reviewed.  Resident's Daily Reports (Ex. 19); Santos Dep. at 22, 28-29 (Ex. 12); Barba Dep. at 73-75 (Ex. 10);

Ayoub Dep. at 17 (Ex. 11).

98.     The City Resident Engineer's Daily Report for May 20, 2010 prepared and signed by Santos references plaintiff's accident.  Ex. 19 at URS 941; Barba Dep. at 75-76 (Ex. 12).

99.     Santos accompanied Barba and Construction and Realty Safety Group safety inspectors hired by URS during safety inspections.  Again, these safety inspections covered activities and conditions on board Pile's barges including cranes and directed that corrective measures be undertaken.  See, e.g., Site Safety Supervisors Log (Ex. 17) at URS 475 (URS listed as "client"); URS 477 (crane inspection);  URS 485 (barge); URS 541 ("SSM walked entire site with Steve Santos"); URS 548 ("SSM walked entire site with Steve Santos and Matt Barba"); see also Barba Dep. at 58-61 (Ex. 10).  Santos had authority to board, and did board, barges as part of his job. Santos Dep. at 35 (Ex. 12).

100.     As "Resident Engineer," Article 31 of the City Standard Construction Contract gave Santos the "power to **inspect, supervise and control** the performance of the **Work**, subject to review by the Commissioner" (emphasis added).  City Standard Construction Contract at Article 31 (Ex. 14 at URS 36).

101.     In addition to Santos's direct power to "correct" safety hazards and issue stop-work orders, he also had the same authority as URS to issue a "stop-work" directive and to ensure

work was stopped if directed by the City; and to "reject" means and methods of construction which "constitute or create a hazard to the Work, or to persons or property." City Standard Construction Contract at Article 4.1 (Ex. 14 at URS 43); See discussion in D above ¶¶ 76-90, which is expressly incorporated herein by reference as pertains to Aecom.

102.    Santos worked daily at the East River Park Project and reported to an office on-site that he shared with Barba, Ayoub and Carla Martins, another URS employee.  Santos Dep. at 14-15 (Ex. 12); Barba Dep. at 14, 18 (Ex. 10).

103.    Santos walked the site daily.  Santos Dep. at 20, 56 (Ex. 12); Nee Dep. at 10 (Ex. 9).

104.    Santos had authority to board, and did board, barges as part of his job function.  Santos Dep. at 35 (Ex. 12).

105.    The City-URS contract and the City-Pile contract also were incorporated into the URS-Aecom subcontract as follows:

> Article 15-Incorporation of Client Agreement.
>
> To the extent applicable to the work to be performed by Subconsultant [Aecom] under this Subcontract, the provisions of the Client Agreement, addenda, amendments, task orders, and other documents forming a part of the Client Agreement are hereby incorporated into this Subcontract with the same force and effect as though set forth in full.  Subconsultant shall be bound to URS, to the same extent that URS is bound to Client, by all of the terms and provisions of the Client Agreement, and by all decisions, rulings, and interpretations of Client or its authorized representative.  A copy of the Agreement is attached as Exhibit B.

URS-Aecom subcontract Article 15 (Ex. 16 at URS 469).

19

Dated:  New York, New York
        September 27, 2011

                              Yours, etc.

                              FRIEDMAN, JAMES & BUCHSBAUM LLP
                              Attorneys for Plaintiff

                              By
                                   /s/ Andrew V. Buchsbaum
                                   Andrew V. Buchsbaum (AB-6475)
                                   132 Nassau Street, Suite 900
                                   New York, NY   10038
                                   T: (212) 233-9385
                                   F: (212) 619-2340


TO:     FREEHILL HOGAN & MAHAR LLP
        Attorneys for Defendant
        Pile Foundation Construction Company, Inc.
        80 Pine Street
        New York, NY  10005-1759
        (212) 425-1900 (tel.)
        (212) 425-1901 (fax)
        Attn:  John F. Karpousis, Esq.
        Attn:  Carolyn Elizabeth Bundy, Esq.

        COZEN O'CONNOR
        Attorneys for Defendants, URS Corporation, Inc.
          and URS Corporation - New York
        45 Broadway, 16th Floor
        New York, NY  10006
        (212) 509-9400 (tel.)
        (212) 509-9492 (fax)
        Attn: Maria Ciccia, Esq.

HANNUM FERETIC PRENDERGAST & MERLINO, LLC
Attorneys for Defendants, The City of New York, The New York
City Department of Parks and Recreation Capital Projects Division,
and The New York City Economic Development Corporation
One Exchange Plaza
55 Broadway, Suite 202
New York, NY  10006
(212) 530-3900 (tel.)
(212) 530-3910 (fax)
(212) 530-3904
Attn:  John E. Hannum, Esq.

COLLERAN, O'HARA & MILLS L.L.P.
Attorneys for defendants Aecom Services, Inc. and Aecom USA, Inc.
1225 Franklin Avenue, Suite 450
Garden City, NY   11530
(516) 248-5757 (tel.)
(516) 742-1765 (fax)
Attn:   John Stackpole Groarke, Esq.