UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------X
JON DAZA,

                  Plaintiff,          <u>OPINION</u>

      -against-

                                  10 Civ. 4678 (MGC)

PILE FOUNDATION CONSTRUCTION
COMPANY, INC., URS CORPORATION,
URS CORPORATION—NEW YORK, THE CITY
OF NEW YORK, THE NEW YORK CITY
DEPARTMENT OF PARKS AND
RECREATION, THE NEW YORK CITY
DEPARTMENT OF PARKS AND RECREATION
CAPITAL PROJECTS DIVISION, THE NEW
YORK CITY ECONOMIC DEVELOPMENT
CORPORATION, AECOM SERVICES, INC.,
AECOM USA, INC., and the Barge
"UNCLE LEO," its equipment,
tackle, and appurtenances, <u>in rem</u>,


                  Defendants.

----------------------------------X

APPEARANCES:

        FRIEDMAN, JAMES & BUCHSBAUM LLP
        Attorneys for Plaintiff
        132 Nassau Street, Suite 900
        New York, New York 10038

        By:  Andrew V. Buchsbaum, Esq.
            Bernard Friedman, Esq.

        FREEHILL HOGAN & MAHAR, LLP
        Attorneys for Defendants Pile Foundation
         Construction Company, Inc., and the
         Barge "Uncle Leo"
        80 Pine Street, 24th Floor
        New York, New York 10005

        By:  John F. Karpousis, Esq.

Carolyn Elizabeth Bundy, Esq.

LEWIS JOHS AVALLONE AVILES, LLP
Attorneys for Defendants URS Corporation
 and URS Corporation—New York
61 Broadway, Suite 2000
New York, New York 10006

By:  Kevin G. Mescall, Esq.

COZEN O'CONNOR
Attorneys for Defendants URS Corporation
 and URS Corporation—New York
45 Broadway, 16th Floor
New York, New York 10006

By:  Anita B. Weinstein, Esq.
     Maria J. Ciccia, Esq.

COLLERAN, O'HARA & MILLS, L.L.P.
Attorneys for Defendants AECOM Services, Inc.
 and AECOM USA, Inc.
1225 Franklin Avenue, Suite 450
Garden City, New York 11530

By:  John Stackpole Groarke, Esq.
     Steven C. Farkas, Esq.

HANNUM FERETIC PRENDERGAST & MERLINO, LLC
Attorneys for Defendants The City of
 New York, The New York City Department
 of Parks and Recreation, The New York
 City Department of Parks and Recreation
 Capital Projects Division, and The New
 York City Economic Development Corporation
55 Broadway, Suite 202
New York, New York 10006

By:  John E. Hannum, Esq.
     David P. Freehan, Esq.

**Cedarbaum, J.**

Jon Daza brings this action to recover damages for injuries he sustained on May 20, 2010, when a crane block weighing at least a ton tipped over and crushed his left leg.  The crane block was located on a barge, the "Uncle Leo," one of three barges owned by Daza's employer, Pile Foundation Construction Company, Inc. ("Pile").  The barge was moored in the East River to assist in an East River Park construction project that Pile had been awarded by the City of New York, its Parks Department, and the Department's Capital Projects Division (collectively, with the City's Economic Development Corporation, "the City"). The City had also hired the predecessor to URS Corporation and URS Corporation-New York (collectively, "URS") as construction manager to oversee the project.  URS in turn hired the predecessor to AECOM Services, Inc. and AECOM USA, Inc. (collectively, "AECOM") as subcontractor to oversee marine construction and demolition.  Anthony Rivara Contracting, LLC, was also named in the complaint as a defendant but has since been dismissed from the action.

The seven counts in Daza's second amended complaint contain two categories of claims against the defendants.  First, he claims that the City, URS, and AECOM are liable to him for negligence under N.Y. Labor Law §§ 200, 240(1), and 246. Second, he claims that Pile is liable to him under either the

Jones Act, 46 U.S.C. § 30104 et seq, or the Longshore and Harbor Workers' Compensation Act ("LHWCA"), 33 U.S.C. § 901 et seq. The defendants have asserted numerous cross-claims against one another for contribution, indemnity, and breach of contract.

All parties now move for summary judgment. Daza moves for partial summary judgment on liability and his Labor Law § 240(1) claims. Pile moves for summary judgment dismissing Daza's claims under the Jones Act and the LHWCA, dismissing its co-defendants' cross-claims for indemnification, and dismissing the City's claim for breach of contract. URS and AECOM move for summary judgment dismissing Daza's Labor Law claims and all cross-claims against them. URS also moves for summary judgment granting its claim of contractual indemnification and contribution against AECOM. The City moves for summary judgment dismissing Daza's Labor Law claims and its co-defendants' claims for contribution. The City also moves for summary judgment granting its claims against URS and AECOM for contractual indemnification, against Pile for common law and contractual indemnification, and against Pile for breach of contract.

For the reasons set forth below, Daza's motion for partial summary judgment on his Labor Law § 240(1) claim against the City is granted. The City's motion for summary judgment is granted dismissing Daza's claims under §§ 200 and 241(6). The summary judgment motions of URS and AECOM are granted,

4

dismissing all of Daza's Labor Law claims against them.  Pile's motion for summary judgment is granted, dismissing Daza's claims under the Jones Act and LHWCA.  Pile's motion for summary judgment is also granted as to the City's cross-claims for common law indemnity and breach of contract, but denied as to the City's cross-claim for contractual indemnity.  Finally, the summary judgment motions of URS and AECOM on the City's claims for indemnity are granted.

### FACTS

Except where otherwise noted, the following facts are undisputed.

### I. The Circumstances of the Injury

Daza has worked in Manhattan as a member of Local 1456 of the Dockbuilders' Union since 2008.  On May 19, 2010, Daza was assigned to a project rebuilding the East River Promenade on the Lower East Side of Manhattan for which Pile was the general contractor.  On that day, Daza rode the Uncle Leo barge from where it had been stationed in Flushing, Queens, to the East River construction site.  That night, the workers, including Daza and his foreman, Brian Nee, disconnected the crane block from one of the cranes on board the Uncle Leo and laid it on its side on the deck of the barge.

A crane block is a large steel apparatus about six-and-one-half feet tall and two feet wide, weighing between one and two

and-one-half tons.  It is suspended from the cables that hang
from the crane's boom.  The block consists of a set of "sheaves"
-- pulleys, essentially -- in its upper portion and a "shackle"
-- a horseshoe-shaped hook -- in its lower portion.  The sheaves
and shackle are connected by a swivel, which allows the shackle
to rotate.  Roughly three-quarters of the deck of the Uncle Leo
was covered by timber "crane mats."  The mats are arranged side
by side and end to end and are intended to protect the deck of
the barge from damage by the cranes.

On the morning of May 20, 2010, the crew set out to replace
one of the cables on the crane block.  Under Nee's direction,
Daza and his fellow workers attached straps to the crane block
and used the crane to hoist the block over to the crane mats.
When the crane operator lowered the block, the shackle wedged
itself into a three-inch gap between two crane mats.  With the
shackle wedged, the block stood vertically without any
additional support or bracing.  Nee then decided to change the
cable while the block was in a standing position.  The workers
removed the straps that the crane had used to hoist the block.

Nee attached a "choker" chain to the top of the crane block
that connected the shackle to the crane boom.  He then directed
Daza to walk to the opposite side of the crane block.  As Daza
began walking to the other side, the crane block toppled over
and struck him on the lower part of his left leg.  Daza

6

sustained four major fractures of the bones in his leg.  He has since undergone three surgeries.  His doctor states that Daza will need anti-inflammatory and narcotic pain-killing medications for the rest of his life and will need ankle replacement or fusion in the future.  Pile is currently paying Daza compensation under the LHWCA, although Daza contends that no final award has been made.

None of the witnesses at the scene who were deposed saw anything that might explain why the crane block toppled over. The block had been standing upright for between five and ten minutes before it collapsed.  Both Nee and Daza testified that they saw no boats pass that could have created a wake that would have rocked the Uncle Leo, though the author of URS's incident report testified that Nee had previously identified "wakes and/or waves" as the "contributing cause" of the accident.  Both Nee and Daza testified that they did not see anyone touch the crane block immediately before it fell.  Although Nee admitted that he initially intended to change the crane block cables while the block was on its side, he also testified that he had previously changed a cable on a crane block in an upright position ten to twelve times.

Daza has submitted two expert reports in support of his claims.  Both experts opine that the accident could have been avoided had the crane block been properly secured.  One expert

states that the wood composing the crane mats was in such shoddy condition that the crane mats should not have been used to support an upright crane block.  The expert further states that, had undamaged crane mats been properly positioned without space between them, the crane block could not have been set in a vertical position.  Neither expert gives an opinion on the actual cause of the accident.

## II.  **The East River Promenade Project**

The East River Promenade project involved the demolition and reconstruction of a promenade running along the East River in lower Manhattan.  Pile won the job pursuant to a $54 million bid it submitted to the City.  Directly to the south of the construction site was a lot owned by the New York City Economic Development Corporation (the "EDC lot").  The EDC lot served as the major land-based route of ingress and egress for the construction site.  It was used for all deliveries and served as a staging area for construction activities including, for much of the time, storage of equipment and materials.  Pile's authorization to use the lot expired in 2007 but, despite the EDC's repeated attempts thereafter to prohibit Pile's use of, at a minimum, the southern portion of the lot, Pile continued to use the lot as a staging area through the date of Daza's accident and beyond.

The City's on-site construction project manager was Mohamed Ayoub.  His responsibilities were to inspect the work done by Pile, negotiate change orders, and coordinate with the construction consultants employed by URS and AECOM.  Ayoub's oversight extended from the face of the sea wall to the construction fences, but not to any barges.  Although Nee testified that Ayoub would give directions on what he wanted done, neither Nee's nor anyone else's testimony indicates that Ayoub gave any instructions regarding what was done on the barges.  Ayoub did not directly supervise Pile employees or control the means of construction, nor was he authorized to stop work he believed to be unsafe.

In April 2001 the City hired URS's predecessor company as a consultant for the project.  URS's on-site project manager was Matthew Barba.  Barba testified that he reported directly to Ayoub.  Barba's responsibilities were to perform daily walkthroughs of the construction site to observe progress and ensure safety.  If work was not being done according to code, he did not have the authority to stop work or change Pile's operations.  Instead, Barba could submit a recommendation to the City describing the problems he saw on site and the City would then decide whether to stop work.  If any directives were handed down by the City, Barba would ensure compliance.

9

Barba's responsibilities were limited to the land boundaries of the construction site and did not include the EDC lot. He testified that he walked out onto construction barges only if doing so provided a better vantage point from which to photograph the land. Barba had no direct control over Pile employees and could not dictate the means or mode of construction. Once a month, URS brought in a third-party safety company, the Construction and Realty Safety Group, to inspect the site, log all activities, and note any noncompliance with safety standards.

URS, in turn, hired a construction subconsultant, AECOM, to oversee the marine portions of the job. Anibal Esteves Santos was AECOM's sole on-site project manager, engineer, and inspector. He, like Barba, reported to Ayoub. Pursuant to AECOM's contract with URS, Santos was responsible for tracking and inspecting the progress of Pile's work, recording the amount of work performed by Pile on a given day, and writing daily log reports with a summary of all activities. Santos, like Barba, only boarded barges to take pictures of what was on land. He had no control over Pile employees. Like Barba, he could not stop work on the project but could submit recommendations to the City that it do so. AECOM's contract made it responsible only for addressing safety hazards arising from its own operations and activities.

10

Ayoub, Barba, and Santos were all at the construction site on the day of the accident, but none of them were on or in view of the Uncle Leo.

### III.  Jon Daza's Employment

After becoming a member of the Dockbuilders' union in 2008, Daza spent the majority of his time working for Pile.  According to his work logs, Daza spent roughly 85% of his days under Pile's direction, with the remaining 15% split between two other construction companies.  Daza's first union job was on the East River project, lasting roughly a year until he left for another job.  He then worked on the project for a second time, beginning one day before his accident in May of 2010.

Daza's duties on the East River Project were to assist in removing old wooden pilings and replacing them with steel pilings.  He also was responsible for loading materials such as pre-cast concrete onto the barges.  Daza estimated that he spent roughly 75-80% of his working time on barges.  Daza admits that he had no responsibility for moving a barge and never steered on any tugboat during the time the barges were moved.  However, Daza did remain on the barges while they were being moved – it is disputed how often he did so -- and would occasionally help with handling lines and lifting and dropping the barge's "spuds," or pilings.  He testified that the barges were moved every three or four days, usually no more than a barge length or

two, and most moves would take no more than two hours.  Daza
also helped with pumping water out of the barges every two days.
While Daza asserted that the pumping took between three to five
hours to complete, he testified that it would only take ten to
fifteen minutes of his time to set up the pump and that he would
then go about his other work.

## DISCUSSION

### I. Summary Judgment Standard

Summary judgment should be granted "if the movant shows
that there is no genuine dispute as to any material fact and the
movant is entitled to judgment as a matter of law."  Fed. R.
Civ. P. 56(a).  A genuine dispute as to a material fact exists
when the evidence is such that a reasonable finder of fact could
return a verdict for the non-moving party.  Anderson v. Liberty
Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d
202 (1986).  In deciding whether a genuine dispute exists, a
court must "construe the facts in the light most favorable to
the non-moving party and must resolve all ambiguities and draw
all reasonable inferences against the movant."  Dallas
Aerospace, Inc. v. CIS Air Corp., 352 F.3d 775, 780 (2d Cir.
2003).

### II.  Pile's Jones Act Liability

Under the Jones Act, "[a] seaman injured in the course of
employment . . . may elect to bring a civil action at law, with

12

the right of trial by jury, against the employer." 46 U.S.C.
§ 30104. Whether one is a seaman depends on the status of the
person, rather than the particular activity undertaken at the
time of the incident. Chandris, Inc. v. Latsis, 515 U.S. 347,
361, 115 S. Ct. 2172, 132 L. Ed. 2d 314 (1995).

In Chandris, the Supreme Court concluded that the essential
requirements of being a seaman are two-fold. First, "an
employee's duties must 'contribut[e] to the function of the
vessel or to the accomplishment of its mission.'" Id. at 368
(quoting McDermott Int'l, Inc. v. Wilander, 498 U.S. 337, 355,
111 S. Ct. 807, 112 L. Ed. 2d 866 (1991)) (internal quotation
marks omitted) (alteration in original). Second, "a seaman must
have a connection to a vessel in navigation (or to an
identifiable group of such vessels) that is substantial in terms
of both its duration and its nature." Id. The test is intended
to exclude land-based workers "who have only a transitory or
sporadic connection to a vessel in navigation, and therefore
whose employment does not regularly expose them to the perils of
the sea." Id. "[T]he ultimate inquiry is whether the worker in
question is a member of the vessel's crew or simply a land-based
employee who happens to be working on the vessel at a given
time." Id. at 370. The Supreme Court teaches that ordinarily
"[a] worker who spends less than about 30 percent of his time in
the service of a vessel in navigation should not qualify as a

13

seaman under the Jones Act." Id. at 371.  This inquiry is a
mixed question of law and fact, and is thus appropriate for the
jury if "reasonable persons, applying the proper legal standard,
could differ" as to whether the employee was a seaman.  Id. at
369 (quoting Wilander, 498 U.S. at 356).

Daza's work as a dockbuilder on the Uncle Leo may satisfy
the first prong of the Chandris test.  His work contributed to
the function of the vessel or to the completion of its mission.
A seaman need not "aid in navigation or contribute to the
transportation of the vessel, but a seaman must be doing the
ship's work."  Wilander, 498 U.S. at 355.  The Uncle Leo's
mission was to serve as a crane barge for a pier-building
construction project.  Daza's work contributed to this mission.

The second prong of the Chandris test, however -- whether
Daza's connection to a "vessel in navigation" was substantial in
duration and nature -- is more difficult.  The facts in this
case are very similar to those in O'Hara v. Weeks Marine, Inc.,
294 F.3d 55 (2d Cir. 2002).  In that case, the plaintiff, a
dockbuilder, spent more than half his working hours during a
five-month period aboard barges, primarily transporting and
assembling construction supplies, while working on the repair of
a Staten Island pier.  Id. at 64.  During that time, however,
the barges were secured to the pier, and none of the plaintiff's
tasks involved sea-based activities.  Id.  The plaintiff

belonged to the dockbuilders' union, had no Coast Guard license
or other "seaman's papers," and never spent the night aboard a
barge.  Id.  He never operated the barge or otherwise assisted
in its navigation.  Id.  The Second Circuit affirmed dismissal,
concluding that the plaintiff could not claim that he "derive[d]
his livelihood from sea-based activities" and that he had, at
best, a "transitory or sporadic" connection to the "vessels in
navigation, in their capacity as vessels in navigation."  Id.
(quoting Chandris, 515 U.S. at 368) (internal quotation marks
omitted).

 Daza's circumstances are almost identical to those of the
plaintiff in O'Hara, with two exceptions.  One, the Uncle Leo
was occasionally unmoored and moved along the East River with
Daza aboard, including the trip from Flushing to the East Side
the day before the accident.  Two, Daza would occasionally help
with sea-related activities.  Daza would sometimes help the
tugboat and barge crews with handling lines and moving spuds,
and he occasionally helped bilge pump the Uncle Leo.

 Nevertheless, this level of involvement with the vessel as
a vessel is not sufficient to make Daza a "seaman" under the
Jones Act.  Daza has submitted evidence showing the movement of
all of Pile's barges.  The name of the barge moved is often not
given.  But even if Daza had been present on and assisted with
every barge movement, the movements occurred at most once a week

on average or, if Daza's deposition testimony is credited, at most twice a week on average.  According to deposition testimony, the movements took two hours at most, meaning that during the course of Daza's 40-hour workweek he was involved in navigation-related activities roughly 5-10% of the time.  The addition of Daza's occasional operation of bilge pumps -- which Daza testified took ten to fifteen minutes to set up and which were operated every two days -- would not bring the percentage of time Daza spent on seaman-related work even close to the 30% guideline set by the Supreme Court in Chandris.

While Daza was more connected to the vessel's navigation than the plaintiff in O'Hara, he was nonetheless a land-based worker who happened to be injured on navigable waters.  Daza does not qualify under the Jones Act as a seaman.

### III. Pile's Liability under the LHWCA

Daza has also brought a negligence claim against Pile under the LHWCA, 33 U.S.C. § 905(b).  The LHWCA provides no-fault worker's compensation benefits, id. § 904, for employees "engaged in maritime employment" should they be injured "in the course of employment," where such employers utilize employees, "in whole or in part, upon the navigable waters of the United States," id. § 902(2)-(4).  The LHWCA excludes from its definition of an employee any "master or member of a crew of any vessel." Id. § 902(3)(G).  Thus, the LHWCA and the Jones Act

16

have been interpreted as providing mutually exclusive remedies for injuries occurring on navigable waters.  The Jones Act covers seamen and the LHWCA covers all other employees.  See O'Hara, 294 F.3d at 62 (citing Sw. Marine, Inc. v. Gizoni, 502 U.S. 81, 86–87, 112 S. Ct. 486, 116 L. Ed. 2d 405 (1991)).  Pile does not dispute that Daza is a covered employee under the LHWCA and that it is currently paying Daza worker's compensation benefits under the statute.

The LHWCA provides that the worker's compensation payments due an injured maritime employee are the exclusive remedy that the employee may seek from his employer.  33 U.S.C. § 905(a). Subsection 905(b) of the LHWCA provides, however, a separate right of action for the employee to sue the owner of a vessel should his injury be caused by the negligence of the vessel owner.  33 U.S.C. § 905(b).  Here, the employer and the vessel owner are the same entity: Pile.

The Supreme Court defined the duties of a vessel owner to a maritime worker using a three-part test in Scindia Steam Navigation Co. v. De Los Santos, 451 U.S. 156, 101 S. Ct. 1614, 68 L.Ed.2d 1 (1981).  That case, however, addressed the question of whether a vessel owner was liable under the Jones Act to a plaintiff employed by a separate entity.  Id. at 158.  The Second Circuit addressed a situation in which a single entity acted in a "dual-capacity" -- that is, as both employer and

17

vessel owner -- in Gravatt v. City of New York, 226 F.3d 108 (2d
Cir. 2000). Gravatt determined that in the dual-capacity
context only one of Scindia's prongs was likely to be useful:
the "turnover duty." In particular, "[i]f because of negligence
of the ship's crew, the vessel's equipment is faulty, or hidden
dangers beset the contracted operation, so that an experienced
contractor could not safely carry out its operations, such
negligence would seem to constitute negligence in the capacity
as vessel." Id. at 122.

Gravatt concluded that the central concern in a dual-
capacity case is "to analyze the allegedly negligent conduct to
determine whether that conduct was performed in the course of
the operation of the owner's vessel as a vessel or whether the
conduct was performed in furtherance of the employer's harbor-
working operations." Id. at 125. "The negligence of the
employer's agents, acting in tasks constituting harbor-work
employment, may not be imputed to their employer in its capacity
as vessel owner." Id.

In Gravatt, a dock builder was employed by a dual-capacity
construction company and vessel owner on a project for the
repair of the fender systems of the 145th Street Bridge over the
Harlem River. 226 F.3d at 112. The dock builder was injured
when the foreman failed to use a choker and improperly used
timber tongs when hoisting old piles that were being removed.

18

Id. at 113.  One pile came loose from the crane and caused another pile to strike the worker and propel him into the water. Id.

The Second Circuit held that the employer could not be responsible under § 905(b) because no one "was engaged in vessel duties at the time of the accident," but only in "construction work . . . separate and apart from the vessel's work."  Id. at 125.  Thus, despite the facts that the injury occurred on the defendant's barge and the negligent individuals were employed by the defendant, the injured employee could not state a claim under § 905(b) because the defendant was responsible only as employer, not as vessel owner.

The facts in this case are indistinguishable from those in Gravatt.  Although Nee, the foreman, was employed by Pile and Pile was the owner of the Uncle Leo, no one on the Uncle Leo was engaged in vessel duties at the time of Daza's injury.  Daza and his co-workers were involved exclusively in changing the cable on the crane block, not in moving the barge, pumping water from the barge, or doing routine vessel maintenance.  The crane itself was not part of the barge.  It was driven onto the barge for the sole purpose of aiding Pile's construction work.  Any negligence was Nee's for allowing the cable to be changed while the crane block was wedged vertically between the crane mats.

Nee was Pile's employee only for the purposes of construction, and not in Pile's capacity as vessel owner.

Nor did Pile violate its turnover duty.  Daza argues that Pile violated its turnover duty in that the crane mats on the deck of the Uncle Leo were in dangerous and defective condition. Daza relies on his expert Stuart Sokoloff, who concludes that the condition of the crane mats contributed to Daza's injury because if they had been in proper condition there would have been no gaps in which to wedge the shackle of the crane block. Further, Sokoloff opined that the swivel and two connection pins on the crane block were not operational in that the block components did not rotate properly.  According to Sokoloff, had rotation been possible, the block could not have been vertically secured and the injury could not have occurred.

These assertions do not create genuine issues of material fact for trial.  First, the crane mats were not defective or dangerous for their intended purpose: to protect the deck of the barge from damage from the cranes and their activities.  Second, the turnover duty with respect to non-faulty equipment requires the vessel owner to disclose hidden dangers that a worker could not uncover by reasonable inspection.  See Scindia, 451 U.S. at 167.  The danger that the mats might be used to support a crane block was clearly not hidden, because the mats were utilized precisely for that purpose.  Third, neither the testimony nor

Sokoloff's expert report indicate that the danger allegedly posed by the faulty swivel -- namely, that the inability to rotate allowed the crane block to stand on end -- was foreseeable by a reasonable vessel owner.

In the case relied on by Daza, the defendant did not deny actual or constructive notice of the defects in question. McConville v. Reinauer Transp. Cos., 16 A.D.3d 387, 390 (2d Dep't 2005). Moreover, the crane that injured the plaintiff in McConville was affixed to the barge.  The crane here was not a regular part of the Uncle Leo.  Both the purportedly defective crane block and crane mats in this case were equipment used for the promenade construction project, not for the operation of the vessel.  Romo v. Massman Const. Co., 615 F. Supp. 2d 488, 493 (E.D. La. 2009) ("Building a scaffold or platform from lumber is not a vessel-related duty but rather is something clearly construction-related.  Any unsafe condition with respect to the scaffolding boards and how they were fastened together was created by [plaintiff's] fellow construction workers when they constructed the platform."). Because the injury was Pile's responsibility as employer and not as vessel owner, Daza does not have a negligence claim against Pile as vessel owner under § 905(b).  Therefore, Daza's exclusive remedy under the LHWCA is statutory worker's compensation.

IV.  **The City's New York Labor Law Liability**

 A. **New York Labor Law § 241(6)**

Daza has brought a claim against the City under N.Y. Labor Law § 241(6).  This statute provides:

> All contractors and owners and their agents . . ., when constructing or demolishing buildings or doing any excavating in connection therewith, shall comply with the following requirements:  . . . All areas in which construction, excavation or demolition work is being performed shall be so constructed, shored, equipped, guarded, arranged, operated and conducted as to provide reasonable and adequate protection and safety to the persons employed therein or lawfully frequenting such places.

N.Y. Lab. Law § 241(6).  The New York Court of Appeals has held that a claim arises under § 241(6) only if a relevant provision of the New York Industrial Code mandates "compliance with concrete specifications."  Ross v. Curtis-Palmer Hydro-Elec. Co., 81 N.Y.2d 494, 505 (1993).  A claim does not arise from provisions that "establish general safety standards by invoking . . . 'general descriptive terms.'"  Id.  (quoting N.Y. Comp. Code R. & Regs. tit. 12 § 23-1.4).  Daza relies on New York Industrial Code § 23-8.1(f)(iv), which provides for protection in construction involving cranes.  Subsection (f)(iv) states: "Before starting to hoist with a mobile crane, tower crane or derrick the following inspection for unsafe conditions shall be made: . . . (iv) The load is well secured and properly balanced in the sling or lifting device before it is lifted more than a

few inches."  This provision mandates compliance with concrete specifications, not general terms.  New York courts have held this subsection to be a proper underlying requirement for a § 241(6) claim.  <u>Marin v. City of N.Y.</u>, 798 N.Y.S.2d 710, No. 36813/01, 2004 WL 2300442, at *3 (N.Y. Sup. Ct. 2004).

The problem for Daza is that subsection (f)(iv) does not apply to the facts of this case.  While it is certainly true that the block was not properly secured, this provision on its face applies to situations where a load is to be hoisted.  The crane block in this case was sitting upright on the crane mats so that its cables could be changed and was not in the process of being lifted or hoisted.  There were no slings or lifting devices for the crew to check at the moment of the accident.  Daza therefore cannot sustain a claim under § 241(6).

### B. New York Labor Law § 240(1)

Daza contends that his injury is covered by N.Y. Labor Law § 240(1).  That statute provides:

> All contractors and owners and their agents . . ., in the erection, demolition, repairing, [or] altering . . . of a building or structure shall furnish or erect, or cause to be furnished or erected for the performance of such labor, scaffolding, hoists, stays, ladders, slings, hangers, blocks, pulleys, braces, irons, ropes, and other devices which shall be so constructed, placed and operated as to give proper protection to a person so employed.

N.Y. Lab. Law § 240(1).  This statute imposes strict liability on owners, general contractors, and their agents, with the

intention of "protect[ing] construction workers not from routine
workplace risks, but from the pronounced risks arising from
construction work site elevation differentials."  Runner v. N.Y.
Stock Exch., Inc., 13 N.Y.3d 599, 603 (2009).  There is no
dispute that New York City and the Parks Department are "owners"
of the East River Promenade construction site.  The Economic
Development Corporation, by contrast, is not an owner, and
Daza's § 240(1) claim against it is dismissed without objection.

The New York Court of Appeals has explained that the
"single decisive question is whether plaintiff's injuries were
the direct consequence of a failure to provide adequate
protection against a risk arising from a physically significant
elevation differential."  Id. at 603.  It drew this "governing
rule" from the purpose of the statute, which is that liability
should attach when an accident occurred after a "protective
device proved inadequate to shield the injured worker from harm
directly flowing from the application of the force of gravity to
an object or person."  Id. at 604 (quoting Ross, 81 N.Y.2d at
501 (emphasis in original)).  It held that even though the
injured worker was pulled laterally into a makeshift pulley, his
injury was "the direct consequence of the application of the
force of gravity" to the falling object on the other side of the
pulley.  Id.  Liability could attach under the statute because
the object's descent was "inadequately regulated."  Id. at 605.

24

The height involved, though short, was not "de minimis, particularly given the weight of the object and the amount of force it was capable of generating, even over the course of a relatively short descent."  Id.

In a recent case, the New York Court of Appeals examined facts that are instructive here.  See Wilinski v. 334 E. 92nd Hous. Dev. Fund Corp., 18 N.Y.3d 1 (2011).  The Court there, applying the principles of Runner, held that a plaintiff may recover under § 240(1) even if his injury is caused by a falling object whose base stands at the same level as the plaintiff, and even if the falling object was not in the process of being hoisted or secured.  Id. at 8-11.  Thus, the Wilinski court determined that the plaintiff could potentially recover where roughly ten-foot metal pipes that were unsecured and standing vertically toppled over and struck the plaintiff's head.  Id. at 5, 8-11.

This case is very similar to Wilinski.  Like the pipes in Wilinski, the crane block here stood vertically and unsecured at a height of (by the smallest estimate) five feet seven inches and fell that distance to the crane mat where it struck Daza's lower leg.  There is no question that, like the plaintiff in Wilinski, Daza suffered harm that flowed directly from the application of the force of gravity to an object.

25

Daza must also show that his injury resulted from the
absence of a safety device statutorily prescribed by the
statute.  Runner, 12 N.Y.3d at 605.  Daza, on the basis of his
expert reports, contends that blocks, stays, slings, or hangers
should have been used to properly secure the block to avoid
injury.  Even in the absence of expert evidence, summary
judgment would be appropriate because "[t]he toppling of a crane
on its side for no apparent reason constitutes a prima facie
violation of Labor Law § 240(1)."  Cosban v. N.Y.C. Transit
Auth., 227 A.D.2d 160, 161 (1st Dep't 1996).  The defendants
have not offered testimony or expert opinions to refute these
conclusions, nor have they offered any alternative explanations
as to the cause of the accident.

The City makes two other arguments in support of its motion
for summary judgment on Daza's § 240(1) claims.  First, the City
argues that the task Daza was performing at the time of his
injury -- replacing the cable on the crane block -- was not an
enumerated activity under the statute.  Rather, according to the
City, it was akin to maintenance.  It is true that § 240(1) does
not cover routine maintenance activities.  Prats v. Port Auth.
of N.Y. & N.J., 100 N.Y.2d 878, 882 (2003).  However, courts
should examine a given injury "on a case-by-case basis,
depending on the context of the work."  Id. at 883.  The purpose
of the statute was to "protect workers employed in the

enumerated acts, even while performing duties ancillary to those acts." Id. at 882 (finding that injury sustained during an inspection taking place during project to renovate air-conditioning systems constituted alteration). See also Aguilar v. Henry Marine Serv., Inc., 12 A.D.3d 542, 544 (2d Dep't 2004) ("Since the plaintiff was walking to retrieve additional solder, he was 'performing duties ancillary' to the repair, reconstruction, or alteration of [a] bulwark, and as such, was entitled to the protection of Labor Law § 240 (1).").

In this case, Daza was engaged in altering a structure -- the East River Promenade -- on behalf of the City. The fact that, at the very instant of the injury, he was re-cabling a crane block is immaterial. The re-cabling of the crane block was in furtherance of the goal of rebuilding the promenade.

Second, the City argues that the accident did not occur on the construction site. Rather, it occurred on a barge in the river, adjacent to the EDC lot, which -- according to the City -- was not part of the construction site. This argument is unavailing. New York courts have held that the fact that "the particular work was being performed at a distance from the site of immediate construction is of no consequence" when "the work was necessitated by virtue of" the construction itself. D'Alto v. 22-24 129th St., LLC, 76 A.D.3d 503, 505-06 (2d Dep't 2010) (quoting Struble v. John Arborio, Inc., 74 A.D.2d 55, 57 (3d

27

Dep't 1980)).  D'Alto held that the fact that plaintiff's injury
had occurred not on the worksite but nearby, where plaintiff was
preparing cement for the site, was irrelevant to liability under
§ 240(1).  Id.  Struble held likewise in the case of a catwalk -
- being used to dismantle a crane being used in construction --
that collapsed.  74 A.D.2d at 57.  Even if the EDC lot is not
considered part of the worksite, § 240(1) still applies.

Finally, the City's co-defendant AECOM briefly argues that
Daza's Labor Law claims are preempted by federal maritime law.
The LHWCA's exclusivity clause, 33 U.S.C. § 905(b), does indeed
preempt state law remedies, but only as against a vessel owner.
See Lee v. Astoria Generating Co., 13 N.Y.3d 382, 391-92 (2009).
Daza is suing the City in its capacity as landowner, so
preemption does not bar his claim.

In sum, the undisputed material facts establish the
liability of New York City and its Parks Department to Daza
under § 240(1).

**C. New York Labor Law § 200**

Daza has also brought a claim against the City under N.Y.
Labor Law § 200.  This statute provides:

> All places to which this chapter applies shall be so
> constructed, equipped, arranged, operated and
> conducted as to provide reasonable and adequate
> protection to the lives, health and safety of all
> persons employed therein or lawfully frequenting such
> places.  All machinery, equipment, and devices in such
> places shall be so placed, operated, guarded, and

> lighted as to provide reasonable and adequate
> protection to all such persons.

N.Y. Lab. Law § 200(1).

Section 200(1) codifies the common law duty of landowners and general contractors to maintain a safe workplace. The parties, and seemingly the precedents, disagree on whether a plaintiff must show <u>both</u> (1) actual or constructive notice of the unsafe condition and (2) supervisory direction or control over the operation, or may show <u>either</u>. <u>Compare</u> <u>Nevins v. Essex Owners Corp.</u>, 276 A.D.2d 315, 316 (1st Dep't 2000) (both), <u>with</u> <u>Higgins v. 1790 Broadway Assocs.</u>, 261 A.D.2d 223, 225 (1st Dep't 1999) (either), <u>and</u> <u>Ortega v. Puccia</u>, 57 A.D.3d 54, 61 (2d Dep't 2008) (intermediate position).

Regardless, neither condition is met here. There is no evidence that the City imposed supervisory control over the means and methods of Pile's work on the Uncle Leo beyond overseeing the progress of the work and inspecting the work product, which is insufficient to show supervision for purposes of § 200. <u>Vaneer v. 993 Intervale Ave. Hous. Dev. Fund Corp.</u>, 5 A.D.3d 161, 162 (1st Dep't 2003) (granting summary judgment to defendant when facts showed that "while defendant would designate a person to inspect the work to insure that it was done according to specifications, there is nothing to suggest that defendant had any involvement in the manner in which the

work was to be performed"). Even the "authority to stop a subcontractor from engaging in an unsafe practice and . . . general oversight of the progress and quality of the work is insufficient to raise a material question of fact with respect to whether defendant exercised the requisite degree of supervision and control over the work." Carney v. Allied Craftsman Gen. Contractors, Inc., 9 A.D.3d 823, 825 (3d Dep't 2004).

Further, the City had no actual or constructive notice of the fact that the crane block had been wedged upright between two crane mats. Knowledge of the gaps between the crane mats is not sufficient notice without knowledge that they would be put to an unintended use. And, as discussed above, Daza has made no showing that anyone was or should have been aware of the alleged defects in the swivel and pins. Gordon v. Am. Museum of Natural History, 67 N.Y.2d 836, 837(1986) ("To constitute constructive notice, a defect must be visible and apparent and it must exist for a sufficient length of time prior to the accident to permit defendant's employees to discover and remedy it."). There is thus no genuine question of material fact that Daza's § 200 claim against the City is without merit.

**V. Contractors' Liability under New York Labor Law § 200**

URS and AECOM imposed no greater supervisory control than the City over the construction crew's actions on the morning of

the accident and they likewise had no actual or constructive notice of the dangerous condition.  Daza thus cannot prove a claim under § 200 against URS or AECOM.

Employees of URS and AECOM toured the work site and ensured that work was progressing according to plan and, at least in URS's case, in compliance with safety regulations.  There is no evidence that they supervised the activities of Pile's foremen and workers on the barges, and no evidence that they boarded the barges other than to observe work taking place on land.  At the time of the accident, neither Barba nor Santos was on or observing the barge, let alone supervising the methods of changing the crane block's cable.

URS and AECOM also had no authority to stop work.  This key factor distinguishes this case from Gravatt v. City of New York, cited to by the City, which involved a contract allowing the defendant to "reject or condemn any. . . apparatus . . . or other appliance which in his opinion, is unsafe, improper or inadequate," and where evidence showed that inspectors did intervene in many instances when they observed safety hazards. No. 97 Civ. 0354 (RWS), 1998 WL 171491, at *17-18 (S.D.N.Y. June 26, 1998) (alteration in original).

## VI.  Contractors' Liability under New York Labor Law § 240(1)

Daza's last claim is under § 240(1) against URS and AECOM. The statute, quoted above, imposes strict liability on owners,

31

contractors, and agents of owners and contractors.  N.Y. Lab.
Law § 240(1).  It is undisputed that URS and AECOM are not
owners of the East River Promenade.  Daza therefore moves for
summary judgment against both defendants on the ground that they
are either contractors or agents of the owner -- the City.

"Although a construction manager of a work site is
generally not responsible for injuries under Labor Law § 240(1),
one may be vicariously liable as an agent of the property owner
for injuries sustained under the statute in an instance where
the manager had the ability to control the activity which
brought about the injury."  Walls v. Turner Constr. Co., 4
N.Y.3d 861, 863-64 (2005).  "Thus, unless a defendant has
supervisory control and authority over the work being done when
the plaintiff is injured, there is no statutory agency
conferring liability under the Labor Law."  Id. at 864.  "The
determinative factor is whether the party had 'the right to
exercise control over the work, not whether it actually
exercised that right.'"  Bakhtadze v. Riddle, 56 A.D.3d 589, 590
(2d Dep't 2008) (quoting Williams v. Dover Home Improvement,
Inc., 276 A.D.2d 626, 626 (2d Dep't 2000)).

Daza relies on Walls, in which the New York Court of
Appeals held a construction manager liable for injuries
sustained by a worker engaged in a window replacement project.
4 N.Y.3d at 864.  The construction manager was responsible for

32

"contractual, statutory, and regulatory compliance by all other trade contractors involved" in the project.  Id. at 862.  If it became aware of any unsafe working conditions or practices, it was required "immediately [to] direct the [contractors] to cease work."  Id. at 863.  Further, the construction manager was to "enforce the terms of the trade contracts and take action within its reasonable control to minimize the loss of life and damage to property during emergencies."  Id.  There was no general contractor on the job.  Id. at 862.  The Court held that the construction manager held the requisite supervisory control and authority to be held liable as an agent of the property owner under § 240(1).  Id. at 864.

Daza relies on another case, Barrios v. City of New York, 75 A.D.3d 517 (2d Dep't 2010), that has facts somewhat more similar to this case.  In Barrios, the construction manager was contractually required to inspect the construction site and report safety issues, to develop a quality control plan taking into account the "safety aspects" of the work, and to meet with contractors to discuss their individually developed safety plans.  Id. at 518-19.  Further, it employed safety officers who had the authority to bring safety concerns to the attention of the foremen.  Id. at 519.  The Court found that the owner had delegated sufficient authority to the construction manager to make it a statutory agent liable under § 240(1).  Id.  In

contrast, in a case where defendants did not have "authority to supervise or control the injured worker or to direct construction procedures or safety measures employed by the general contractor," the defendants, in reasoning upheld by the Court of Appeals, were not considered agents.  Fox v. Jenny Eng'g Corp., 122 A.D.2d 532, 532 (4th Dep't 1986), aff'd, 70 N.Y.2d 761 (1987).

There is no genuine issue of material fact that URS and AECOM did not have sufficient supervisory control and authority over the means and methods of the activities that led to Daza's injuries.  URS and AECOM were hired to oversee construction activities and generally ensure workplace safety.  While Pile is not contractually designated a general contractor, it appears to have functioned as one, directly controlling the East River Project and having the ability to hire subcontractors.  URS and AECOM did not have the sort of detailed safety coordination functions noted in Barrios, and most importantly, they lacked the independent authority to stop work found in Walls and crucial to the holding in Fox. To the extent that the actions on the ground of URS and AECOM can be taken into consideration, they highlight even more strongly the defendants' lack of authority over Daza's actions, as discussed supra.  Thus, Daza cannot sustain his § 240(1) claim against URS and AECOM.

## VII. Claims for Indemnification Among the Defendants

As explained above, Daza's only viable claim is against the City under N.Y. Labor Law § 240(1).  Thus, only the City's claims against its co-defendants for indemnity and contribution need to be reached; any other claims for indemnity among the defendants are moot.  The City has raised indemnity claims against its co-defendants under various theories.  First, it claims contractual and common law indemnity from Pile and claims Pile breached its contractual insurance provisions with the City.  Second, it claims contractual and common law indemnity from URS and AECOM.

### A. The City's Claims for Breach of Contract and Contractual Indemnification against Pile

The City's contract with Pile provides in Paragraph 7.4:

> If any person or property sustains any loss, damage, cost, expense or injury arising out of the operations of the Contractor . . . in the performance of this Contract . . ., the Contractor shall indemnify, defend and hold the City, its employees and agents harmless against any and all claims . . . arising from or in any way related to such operations . . . .

The contract also provides under Article 22.1 that Pile must provide a commercial general liability insurance policy in its own name, naming the City as an additional insured, "to cover the liability assumed by the Contractor under the indemnity provisions of this Contract" up to an amount provided in Schedule A.  That schedule provides that the insurance limits

had to be at least $2,000,000 per occurrence and $5,000,000 in
the aggregate.   Pile's general commercial insurance policy with
the insurer Valiant lists liability insurance at $1,000,000 per
occurrence and $2,000,000 in the aggregate.   However, Pile
obtained an additional umbrella insurance policy from New
Hampshire Insurance Company extending coverage to $5,000,000 per
occurrence, well past the levels required by the contract.
There is no genuine issue of fact that Pile obtained the proper
amount of insurance.   Thus, there is no breach of contract.

The City also argues that Pile must indemnify it for any
liability stemming from Daza's injury.   The City's negligence-
based common law indemnification claim against Pile is precluded
because Pile is an employer paying worker's compensation
benefits under the LHWCA and, as such, is immune from further
tort-based contribution to third parties.   See 33 U.S.C. §
905(a).

Contract-based indemnity claims are not precluded by the
statute.   Triguero v. Consol. Rail Corp., 932 F.2d 95, 101 (2d
Cir. 1991).   This claim for indemnification, however, is
asserted not by the City directly but rather by the insurer,
Valiant, on the City's behalf.   New York's anti-subrogation rule
provides that an "insurer has no right of subrogation against
its own insured for a claim arising from the very risk for which
the insured was covered.   This rule applies even where the

insured has expressly agreed to indemnify the party from whom the insurer's rights are derived and has procured separate insurance covering the same risk." Penn Gen. Ins. Co. v. Austin Powder Co., 68 N.Y.2d 465, 468 (1986). Valiant, standing in the shoes of the City, thus has no right to indemnification from Pile, its own insured, for the sums that are covered by the policy.

Still, Daza's complaint asserts that he is entitled to $10,000,000 in damages from the City, a sum higher than that encompassed by the insurance claims, and the indemnification clause does not cap Pile's indemnification obligations. If Daza obtains sums from the City greater than those covered by insurance, the City will still have an indemnification claim for those sums. See Antonitti v. City of Glen Cove, 266 A.D.2d 487, 489 (2d Dep't 1999) (holding that certain indemnification claims "should be dismissed pro tanto to the extent of payments actually made by the insurer").

## B. The City's Claim for Indemnification against URS and AECOM

The City has moved for summary judgment on its claims for contractual indemnity against URS and AECOM, and those defendants have moved for summary judgment on the City's claims for common law and contractual indemnification. The City's contract with URS provides in Article 14:

> The Consultant shall be liable and hereby agrees to
> indemnify and hold harmless the Commissioner and the
> City . . . against all claims . . . for bodily injury
> . . . arising out of the negligent performance of
> professional services or caused by any negligent
> error, omission or act of the Consultant or anyone
> employed by the Consultant in the performance of this
> contract."

URS's contract with AECOM provides in Article 6:

> Subconsultant agrees to indemnify, defend, and hold
> URS and Client . . . harmless from and against any and
> all claims . . . which are or may be asserted against
> URS or Client by any person or entity, and which arise
> out of or result from, in whole or in part, the
> negligent or willful acts or omissions of
> Subconsultant in performance of services under this
> Subcontract. The acceptance of said services by URS or
> Client shall not operate as a waiver of such right of
> indemnification.

Under the contract, "Client" is defined as the Commissioner of
the New York City Parks Department.

The City argues that, under New York law, "[a] party is
entitled to full contractual indemnification provided that the
'intention to indemnify can be clearly implied from the language
and purposes of the entire agreement and the surrounding facts
and circumstances.'" Drzewinski v. Atl. Scaffold & Ladder Co.,
70 N.Y.2d 774, 777 (1987) (quoting Margolin v. N.Y. Life Ins.
Co., 32 N.Y.2d 149, 153 (1973)).  The City argues that URS and
AECOM were negligent in their supervision of the East River
project construction site and must indemnify the City.

The claim fails.  As discussed above, URS and AECOM had no
authority or responsibility to inspect the Uncle Leo for

38

potential safety hazards and thus owed no duty of care relating
to Daza's accident.  Even if they did, as discussed above, there
is no evidence that any obviously defective or dangerous
condition of the Uncle Leo caused Daza's injury.  Finally,
neither URS nor AECOM had any supervisory control over the means
or methods of construction, and were not present at or near the
Uncle Leo -- nor were they required to be -- on the morning of
the accident.  The City's claims for negligence-based common law
indemnification fail for the same reasons.

## CONCLUSION

For the foregoing reasons, Pile's motion for summary
judgment is granted, dismissing Daza's claims under the Jones
Act and the LHWCA.  Daza's motion for partial summary judgment
on liability is granted as to his claim against the City of New
York and the Parks Department under N.Y. Labor Law § 240(1).
The summary judgment motions of the City, URS, and AECOM are
granted, dismissing Daza's claims against the three defendants
under N.Y. Labor Law §§ 200 and 241(6).  The summary judgment
motions of URS and AECOM are granted, dismissing Daza's claims
against them under N.Y. Labor Law § 240(1).  Pile's motion for
summary judgment is granted, dismissing the City's claims for
common law indemnity and breach of contract, but denied as to
the City's claims for contractual indemnity.  Summary judgment

is granted to URS and AECOM, dismissing the City's claim for

contractual indemnity.


SO ORDERED.

Dated:     New York, New York
           December 5, 2013


                              S/_____
                                 MIRIAM GOLDMAN CEDARBAUM
                                 United States District Judge